## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | CV No. 1:22-cv-01053-JMC |
| United States Department of Justice | ) | |
| Post Office Box 261 | ) | |
| Ben Franklin Station | ) | **REDACTED** COMPLAINT OF THE |
| Washington, DC 20044 | ) | **UNITED STATES OF AMERICA FOR:** |
| | ) | |
| Plaintiff, | ) | **1. VIOLATION OF THE FALSE** |
| | ) | **CLAIMS ACT  31 U.S.C. §** |
| v. | ) | **3729(a)(1)(A)** |
| | ) | **2. VIOLATION OF THE FALSE** |
| **INTELLIGENT FISCAL OPTIMAL** | ) | **CLAIMS ACT  31 U.S.C. §** |
| **SOLUTIONS, LLC a/k/a iFOS,** | ) | **3729(a)(1)(B)** |
| 10632 Little Patuxent Parkway, Suite 306 | ) | **3. VIOLATION OF THE FALSE** |
| Columbia, Maryland   21044; and | ) | **CLAIMS ACT  31 U.S.C. §** |
| | ) | **3729(a)(1)(C)** |
| **TAWANDA MARIA SMITH,** | ) | **4. BREACH OF CONTRACT** |
| 9317 Old Line Drive | ) | **5. PAYMENT BY MISTAKE** |
| Columbia, Maryland   21045; | ) | **6. UNJUST ENRICHMENT** |
| | ) | |
| Defendants. | ) | **JURY TRIAL DEMANDED** |
| _____ | ) | |

## OVERVIEW

1.      This is an action brought by the United States to recover damages and civil

penalties under the False Claims Act (FCA), 31 U.S.C. §§ 3729-33 and to recover all available

damages for breach of contract, payment under mistake of fact, and unjust enrichment.

2.      Defendants engaged in a fraudulent scheme in connection with a contract between

Defendant Intelligent Fiscal Optimal Solutions, LLC (iFOS) and the United States Department of

Homeland Security (DHS).  In November and December 2015, Defendant Tawanda Smith, the

President and sole owner of iFOS, and other iFOS employees met with Kenneth J. Buck, Ph.D.,

then the DHS Executive Director of the Office of Management Integration in the Office of the

Under Secretary for Management, a Senior Executive Service position, while he was still

employed at DHS.  Dr. Buck informed Ms. Smith and iFOS about a potential DHS contract that

would be under the responsibility of the Office of Management Integration, which he then

oversaw, and told her that he had drafted the Statement of Work for the contract.  Within days of

the iFOS meeting and while still employed at DHS, Dr. Buck informed his subordinate, the then

Deputy Director for Management Integration ("Deputy Director"),[1] who was soon to replace

him, that he would soon be leaving DHS and thereafter would be working with iFOS.  Within

four days of learning that Dr. Buck would be leaving DHS and working with iFOS, the Deputy

Director selected iFOS to be the contractor on a support contract, which she would oversee for

the Office of Management Integration.

3.      After leaving DHS, Dr. Buck, though his company, Transformation Systems

International, LLC, became a sub-contractor and consultant to iFOS, working on the same

contract for which he claimed to have drafted the Statement of Work during his tenure as a DHS

official.  With assistance of Dr. Buck, iFOS and Ms. Smith prepared and submitted a signed

Technical Proposal to DHS which falsely identified iFOS employee B.A.S. as the Strategic

Advisor to the proposed contract, when, in reality, iFOS intended to and ultimately used Dr.

Buck to perform the Strategic Advisor responsibilities notwithstanding the mandatory post-

employment restrictions imposed on Dr. Buck pursuant to the Ethics in Government Act, 18

U.S.C. § 207(c).

4.      In order to further conceal Dr. Buck's work on the contract from DHS contracting

officials and to avoid a contractually required DHS mandatory suitability background

investigation for Dr. Buck, iFOS, Ms. Smith, and others agreed to conceal Dr. Buck's substantial

---

[1]      In January 2016, the Deputy Director replaced Dr. Buck and became the Executive
Director of the Office of Management Integration.  For the purpose of consistency, she is
referred to as the Deputy Director throughout the Complaint.

involvement with the contract and engaged in affirmative acts to hide Dr. Buck's work on the contract by: (a) falsely identifying iFOS employee B.A.S. as the Strategic Advisor; (b) using personal telephone, email and text accounts to communicate directly with Dr. Buck; (c) using iFOS email accounts which concealed Dr. Buck's identity; (d) removing Dr. Buck's name from iFOS documents he wrote and edited; and (e) sending coded messages on the iFOS group email for the project to conceal Dr. Buck's role.  Moreover, until July 2017, iFOS and Ms. Smith never identified Dr. Buck's role on the contract and knowingly submitted false invoices to DHS in which it billed Dr. Buck's time on the contract under the name of iFOS employee B.A.S.  At no point did iFOS or Ms. Smith disclose to DHS contracting personnel the role that Dr. Buck and others played in steering the contract to iFOS.  Once DHS contracting personnel discovered Dr. Buck's involvement in the contract, nearly 15 months into the contract term, they required a mandatory suitability background investigation for Dr. Buck.  iFOS never submitted Dr. Buck for mandatory suitability background investigation, and, instead, the company simply stopped billing for Dr. Buck under the contract.  iFOS was paid over $628,322 under the contract, including over $150,000 for nearly 700 hours worked by Dr. Buck that iFOS falsely billed under the name of iFOS employee B.A.S.

## JURISDICTION

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1331. The Defendants are doing and/or previously did business within this District.

## VENUE

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a).  All Defendants are doing and/or previously did business within this District. Defendant Smith resides within the District and iFOS is headquartered in the District.

## PARTIES

### The United States of America

7.      The plaintiff is the United States of America.  The United States brings this lawsuit on behalf of its agency, DHS.  The DHS contract at issue in this action, Contract HSHQDC-16-C-00040, was issued by and performed at the DHS Headquarters located at 245 Murray Lane, SW, Washington, DC 20528-0075.

### The Defendants

8.      Defendant iFOS is a limited liability corporation that was incorporated by Defendant Tawanda Smith on or about April 3, 2009.  The registered address for iFOS is 10632 Little Patuxent Parkway, Suite 306, Columbia, Maryland 21044.

9.      Defendant Tawanda Maria Smith, an individual, is the Chief Executive Officer of iFOS.  Her last known address is 9317 Old Line Drive, Columbia, Maryland 21045.  Ms. Smith is the president and sole shareholder of iFOS.

### The False Claims Act

10.      The False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, is the primary remedial statute designed to deter fraud upon the United States. Sections 3729(a)(1)(A), 3729(a)(1)(B), and 3729(a)(1)(C) of the applicable version of the FCA are relevant here.

11.      Section (a)(1) of the False Claims Act imposes civil liability, in pertinent part, upon any person, who in dealing with the Government, either "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;" ... or "(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)[.]"  31 U.S.C. §§ 3729(a)(1)(A), (B), and (C).

12.     False Claims Act liability may be imposed where the United States was fraudulently induced to enter a contact.  Where the Government was induced by, or relied upon, the fraudulent statement or omission when it awarded a contract or when it agreed to contract modifications.

13.     The False Claims Act defines "knowing" and "knowingly" to include actual knowledge, deliberate ignorance, or reckless disregard and requires no proof of specific intent to defraud.  See 31 U.S.C. § 3729(b)(1)(A),(B). The term "material," as used in the FCA, "means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  See 31 U .S.C. § 3729(b)(4).

14.     As pertinent herein, the False Claims Act imposes liability of treble damages plus a civil penalty for each false claim.  The False Claims Act also imposes a penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Adjustment Act of 1990, 28 U.S.C. 2461 note; Pub. Law No. 104-410.  *See* 31 U.S.C. 3729(a).   Pursuant to the Bipartisan Budget Act of 2015, all civil statutory penalties, including those set forth in the FCA, are required to be adjusted annually for inflation.  See Pub. Law. No. 114-74, § 701, 129 Stat. 584, 599.  As a result, for any FCA violation occurring after November 2, 2015, the FCA imposes a penalty of not less than $5,000 and not more than $10,000, as adjusted by the Bipartisan Budget Act of 2015.  *See* 28 C.F.R. § 85.5 (identifying civil statutory penalty amounts currently in effect, including Congressionally-mandated annual inflation adjustments).  At this time, the inflation-adjusted penalty for any FCA violation occurring after November 2, 2015, is not less than $11,665 and not more than $23,331 per claim.  *See id.*

## THE FRAUDULENT SCHEME

15.     At all times relevant to the allegations in this Complaint, iFOS, Ms. Smith and others engaged in a fraudulent scheme in which they submitted or caused to be submitted to DHS false claims for payment and falsely certified invoices to obtain contractual payments to which iFOS was not entitled.  As detailed further below, the Defendants abused the DHS contracting system by manipulating the contracting process to assist iFOS in obtaining a contract with DHS; actively hiding Dr. Buck's involvement in the procurement, management, and provision of services under that contract; concealing Dr. Buck's violations of federal conflict-of-interest rules; and falsely promising to submit all employees for a mandatory suitability background investigation despite the company's intention not to do so for Dr. Buck.  The defendants submitted false invoices and falsified timesheets which billed Dr. Buck's hours under the name of another iFOS employee whom iFOS falsely represented would serve as the Strategic Advisor on the contract.  Additionally, iFOS, Ms. Smith and others conspired to conceal Dr. Buck's involvement in the contract and took affirmative action to hide his involvement in the iFOS contract, including by billing all time for Dr. Buck under the name of another iFOS employee; using personal telephone, email and text message account; using iFOS email accounts that hid Dr. Buck's identity; removing Dr. Buck's name from documents he wrote and/or edited; and sending coded messages using the iFOS group email account for the contract.  This contract was obtained by fraud and, in the course of the contract, iFOS, and Ms. Smith submitted or caused to be submitted false claims for payment and false statements for the purpose of obtaining payment.

16.     During the one-year period after his retirement from DHS on January 8, 2016, Dr. Buck had extensive direct contacts with his replacement, the Deputy Director, including over 780 telephone calls and text messages, made to influence the Deputy Director to take official

actions on the contract, including *inter alia* actively hiding Dr. Buck's involvement on the contract, which would have triggered the required suitability background investigation of Dr. Buck, and supporting the extension of the contract for another one year period, modifications to add additional funds to the contract, and extensions on contract projects.  Together, Dr. Buck, iFOS, Ms. Smith and others acted in concert to conceal Dr. Buck's violations of federal conflict-of-interest prohibitions.  They also acted in concert to conceal Dr. Buck's work on the contract while iFOS and Ms. Smith were submitting invoices and timesheets falsely stating that Dr. Buck's work was performed by another iFOS employee.

### a.      The Fraudulent Scheme to Obtain the iFOS Contract

17.      In November and December 2015, Ms. Smith and others spoke with Dr. Buck, who was at the time still employed by DHS, about possible business opportunities, including contracts with DHS.  On November 30, 2015, at 3:43 p.m., the iFOS Chief Administrative Officer, K.F., emailed Dr. Buck regarding "collaboration amongst consulting firms," which read "Nice speaking with you today.  I will advise via email when Mrs. Smith is back in the office."

18.      Two days later, iFOS scheduled a meeting with Dr. Buck for December 9, 2015. Ms. Smith emailed her acceptance of this meeting on December 2, 2015.

19.      On December 8, 2015, at 7:59 a.m., the Deputy Director and Dr. Buck commenced a telephone call that lasted approximately 20 minutes.   That same day, approximately three hours later at 11:22 a.m., while still employed at DHS, Dr. Buck used his non-DHS personal email account to email his resume to K.F. in advance of his meeting with iFOS scheduled for the following day.

20.      On December 9, 2015, iFOS and Ms. Smith met with Dr. Buck, who was still employed at DHS.  During that meeting, they discussed potential contracting opportunities with

DHS and naming Dr. Buck "as part of Board of Advisory or some such advisory group to help oversee the effort."

21.     On December 17, 2015, while still employed at DHS, Dr. Buck again met with Ms. Smith and other iFOS personnel at iFOS' office.  The invitation for that meeting stated the subject was "partnering DHS/IRS."  During that meeting, Dr. Buck, Ms. Smith, and K.F. discussed the potential opportunity for iFOS at DHS.  On December 18, 2015, Ms. Smith emailed iFOS personnel about preparing a new vendor package for Dr. Buck's prospective engagement by iFOS following his separation from DHS.

22.     Prior to leaving DHS, in September 2015, Dr. Buck participated in the preparation of a draft of the Statement of Work, formally known as a "Requirements Statement," for the DHS contract that was ultimately awarded to iFOS.  During Dr. Buck's December 2015 meetings with Ms. Smith and iFOS personnel, Dr. Buck represented that he had written the Requirements Statement.

23.     Prior to Dr. Buck's separation from DHS, during an in-person conversation with the Deputy Director in their DHS office, he informed her that he would soon be leaving DHS and would be working with iFOS after he left DHS.

24.     By at least December 17, 2015, the Deputy Director was informed that she would be replacing Dr. Buck as Executive Director.  On December 18, 2015 at 3:56 p.m., the Deputy Director informed another former colleague at FEMA that Dr. Buck was leaving his job at DHS and that she would be replacing him.  Thirty minutes later, the Deputy Director forwarded the draft Requirements Statement for the potential DHS contract from her DHS email to her personal gmail account.

25.     Four days after the Deputy Director's conversation with Dr. Buck about his planned subcontract relationship with iFOS, the Deputy Director identified iFOS as a potential contractor to DHS Office of Procurement Operations (DHS OPO).  On December 22, 2015, the Deputy Director contacted the DHS OPO regarding the selection of iFOS to provide staff augmentation support to OUSM.  iFOS was the only contractor that the Deputy Director seriously considered.  At no point did the Deputy Director inform others at DHS that she knew that Dr. Buck would be working with iFOS on the contract after DHS awarded iFOS the contract.  Prior to December 22, 2015, there is no evidence that the Deputy Director had ever discussed iFOS with anyone other than Dr. Buck.

26.     On January 5, 2016, iFOS CEO Ms. Smith received an email from DHS OPO proposing a meeting on January 12, 2016.  In response, Ms. Smith emailed iFOS employee, B.A.S., stating:  "Okay, this is Ken's work.  Reach out to Ken since he would need to assist you with preparing a presentation for the meeting based upon the tasks identified in the SOW he [Dr. Buck] wrote for them."  The same day, Ms. Smith forwarded an email to K.F. regarding "DHS presentation – KB.msg" with an attachment with the same name.  The only text in Ms. Smith's email was "FYI …………"  At the time that this email was sent, Dr. Buck was still employed by DHS.

27.     While he was still employed by DHS, Dr. Buck provided iFOS with non-public internal DHS information and advice concerning the potential contract with DHS.  On Wednesday, January 6, 2016, iFOS employee B.A.S. emailed Dr. Buck, who was still employed by DHS, on Dr. Buck's personal email:  "Great speaking with you this afternoon, thanks for your insights.  We'll need you to complete the attached document as soon as possible.  I'm putting together our presentation and I'll need your assistance with some of the items.  I'll forward you a

draft as soon as possible."  The "presentation" and "draft" that B.A.S. referred to was iFOS'

presentation to DHS for the proposed SBA 8(a) sole source contract to provide professional

support services to the DHS OUSM contract (hereinafter OUSM contract or iFOS contract) that

the Deputy Director would manage.  Dr. Buck forwarded the email from B.A.S. to himself at his

DHS email address.  Dr. Buck responded to B.A.S., "I will call you tomorrow as I learn more."

28.     On Friday, January 8, 2016, Dr. Buck resigned as the Executive Director for

Management Integration at the DHS OUSM.

29.     On Monday, January 11, 2016, Dr. Buck was a "required attendee" at a meeting

organized by K.F., with Ms. Smith and BAS, on the subject of "meeting to discuss potential."

The primary subject of discussion at this meeting was the DHS contract.

30.     On January 12, 2016, DHS OPO personnel attended the iFOS presentation to

DHS OUSM about its capacities as a contractor.  Ms. Smith gave the presentation which did not

include any mention of Dr. Buck.  None of the DHS OPO personnel were aware of Dr. Buck's

involvement with iFOS or the plan for him to serve surreptitiously as the Strategic Advisor under

the contract without undergoing a mandatory suitability background investigation and in

violation of federal conflict-of-interest rules.  The iFOS' presentation to DHS OUSM included

material and information supplied to iFOS by Dr. Buck, including material provided to iFOS

while Dr. Buck was still employed by DHS.  Ms. Smith participated in the preparation of this

presentation and made the presentation to DHS OPO personnel.

31.     The same day as the first meeting between DHS contracting personnel and iFOS,

the Deputy Director decided to proceed with iFOS as the contractor.  On January 12, 2016, the

Deputy Director informed others at DHS: "I am ready to move forward with iFOS pending

funding" as the contractor for the OUSM contract.  On January 14, 2016, the Deputy Director

informed the group that she had secured the funding for the iFOS contract and "[w]e can move forward." On this day, the Deputy Director and Dr. Buck exchanged eleven text messages. On information belief, these communications, in whole or in part, addressed the prospective contract with iFOS and were intended to influence DHS action on the contract.

32.     iFOS and Ms. Smith received updates on the timing of the DHS contracting process from Dr. Buck. Dr. Buck bragged to iFOS personnel that the Deputy Director was providing him with information about the status of the contract award process from DHS. On February 2, 2016, Dr. Buck spoke to the Deputy Director for nearly twenty minutes, as well as exchanged multiple text messages. The following day, on February 3, 2016, Dr. Buck emailed Ms. Smith, K.F., and B.A.S. regarding the "upcoming requirement." He stated: "I think you can expect the DHS requirement to be coming soon. The delay occurred because they wanted to add a few options periods which would increase the value to just under $1M." In the three-day period before his February 3, 2016 email, Dr. Buck and the Deputy Director exchanged 205 text messages and spent nineteen minutes on the telephone.

33.     Dr. Buck continued to provide iFOS with information about the ongoing DHS contracting process provided to him by the Deputy Director. On February 12, 2016, Dr. Buck informed B.A.S. that the target date for the issuance of the DHS request for proposal was February 18, 2016, but that it could come earlier. The day before, the Deputy Director and Dr. Buck talked for 15 minutes on the phone and had exchanged four text messages. On February 12, 2016, they exchanged an additional five text messages.

34.     On February 18, 2016, DHS contracting personnel sent iFOS a request for proposal for the OUSM contract. Section H 4.0 of the Attachment A to the Request for Proposal stated: "All contractor and subcontractor personnel are required to complete a

suitability/background investigation with the DHS Office of Security, Personnel Security Division."

35.     iFOS, Ms. Smith, and Dr. Buck intended for him to serve as the Strategic Advisor under the proposed contract without completing the mandatory suitability/background investigation and despite the restrictions imposed by federal conflict-of-interest rules that prohibited direct contact with his former agency to influence agency action on the contract.  On February 18, 2016, B.A.S. sent Dr. Buck an email with the re line "Cost Proposal" which stated: "Ken, to assist us with preparing our cost proposal, please provide your hourly rate for performing 520 hours of work as well as your methodology for accomplishing the tasks below. Please note: no names will be mentioned in our cost proposal. We'll need the information no later than Feb 24…"  Dr. Buck responded to B.A.S.: "Most excellent!  About dang time.  I will have my piece done by tomorrow afternoon."

36.     The same day, February 18, 2016, Dr. Buck emailed iFOS personnel:  "Did they ask for resumes and will they name Key Personnel?  If so, when I met with Tawanda [Smith] and [K.F.] at the outset, we had discussed naming me as part of your Board of Advisors or some such advisory group to help oversee the effort.  Just a thought."  On this day, the Deputy Director spoke to Dr. Buck twice for a total of over 23 minutes and exchanged eight text messages with her.

37.     iFOS sought clarification from DHS as to whether mandatory suitability background investigations would be required of its off-site technical experts.  On February 19, 2016, DHS sent iFOS the Statement of Work questions for the OUSM contract.  Among other questions, iFOS asked for clarification regarding Question #7:

> Section H, Item 4.0, pg. 10, Clarify the intent of this section applies only to contractor personnel reporting onsite to DHS is required to complete

suitability/background investigation with the DHS Office of Security, Personnel
Security Division. We assume the aforementioned requirement does not apply to
contractor administrative personnel used within our facility to perform quality
control review of project deliverables and/or technical experts used for the work
effort in preparing deliverables for final submission to the COR.

On this day, the Deputy Director spoke with Dr. Buck twice for a total of over 15 minutes and

exchanged 24 text messages.

38.     Dr. Buck requested that iFOS pay him $200 per hour under the DHS contract.  On

February 21, 2016, Dr. Buck sent B.A.S. and K.F. an email with an attachment which read:

> (1)     The iFOS team brings a wealth of experience to
> supporting the development and issuance of strategic documents for
> our federal sector clients. A key member of the team will consist of
> a former Ph.D.-level senior executive with over 32 years of
> experience at the three largest federal sector Cabinet-agencies.
> (2)     As supported in the previous section, the iFOS team
> collectively possesses the following knowledge, experience and
> expertise:
> (3)     Five years of recent hands-on executive level
> experience with current DHS missions, priorities and major
> business processes, including federal employment with FEMA.
> (4)     Direct hourly rate for this individual = $200/hour.

The attachment made no mention of his years as the Executive Director of DHS OMI, a position

directly relevant to the work under the proposed DHS contract.

39.     DHS responded to iFOS' questions, expressly advising that technical experts

would be subject to a suitability background investigation.  On February 22, 2016, DHS

responded to iFOS' questions, including Question 7 to DHS stated:  "The 3 named labor

categories requested for this requirement will have to complete a suitability background

investigation regardless of off/on-site."  (emphasis added).  iFOS personnel forwarded DHS'

responses to these questions, including the background investigation issue, to Ms. Smith on

February 22, 2016.  Therefore, by February 22, 2016, iFOS and Ms. Smith were aware that all

"off-site technical experts" would need to complete a suitability background investigation in

order to work on the contract.  However, iFOS and Ms. Smith never intended to comply with this contractual obligation as to Dr. Buck, for whom a background investigation could reveal his direct communications with the Deputy Director on behalf of iFOS that were prohibited under federal conflict-of-interest laws.

40.     iFOS and Ms. Smith decided that B.A.S. would be identified as the Strategic Advisor in order to avoid disclosing Dr. Buck's work on the contract and to avoid a suitability background investigation for Dr. Buck.  Late in the day on February 22, 2016, B.A.S. emailed Dr. Buck a message entitled "DHS Background investigations" which read in part:  "As we see it, one option is for [the Deputy Director] to accept myself [B.A.S.] as the senior advisor and [project manager].  The other option is for you to hire a person through your company that we could present for the suitability background. Please advise."  Dr. Buck responded: "Wow- let me think on it and let's discuss tomorrow. I'm leaning to your idea for expedience."  On this day, the Deputy Director and Dr. Buck spoke by telephone and exchanged two text messages.  On the next day, February 23, 2016, the Deputy Director and Dr. Buck exchanged twelve text messages.

41.     iFOS and Ms. Smith intended that Dr. Buck would perform the work on the DHS contract but understood that if iFOS identified Dr. Buck as the Strategic Advisor, DHS would require that he complete a suitability background investigation.  Because of Dr. Buck's mandatory one-year cooling off period imposed by federal law, iFOS was concerned that DHS would likely reject or limit Dr. Buck's involvement with the iFOS contract and, in particular, with the Deputy Director who supervised iFOS' work under the contract.  Ultimately, all other iFOS employees, including B.A.S., and subcontractor personnel, as well as several potential iFOS employees, completed the mandatory background investigation.  Dr. Buck was the only iFOS employee or subcontractor who did not complete the mandatory background investigation.

42.     On February 29, 2016, iFOS submitted its Technical Proposal to DHS for the OUSM contract.  This document accepted the terms of DHS' draft solicitation and explained how iFOS would perform those tasks.  iFOS expressly identified iFOS employee B.A.S., not Dr. Buck, as the Strategic Advisor and Project Manager.  Ms. Smith personally signed and submitted the technical proposal under her signature.  At the time it was submitted, both iFOS and Ms. Smith knew that Dr. Buck, not B.A.S., would surreptitiously interface with the Deputy Director as iFOS' Strategic Advisor on the contract without completing the mandatory background investigation and in violation of federal conflict-of-interest rules that restricted his direct communications with the Deputy Director on behalf of iFOS.

43.     As iFOS expected, the Deputy Director accepted B.A.S. as the "senior advisor" while the Deputy Director knew that Dr. Buck was surreptitiously serving in this role and maintaining near daily direct contact with her on behalf of iFOS in violation of federal conflict-of-interest rules.

44.     iFOS personnel, including Smith and B.A.S., knew that Dr. Buck was communicating directly with Deputy Director on behalf of iFOS during Dr. Buck's mandatory one-year cooling off period.

    b.     **The Fraudulent Scheme to Hide Dr. Buck's Role in the iFOS Contract**

45.     On March 15, 2016, the OUSM contract No. HSHQDC-16-C-00040 was executed by iFOS and DHS for a term of March 16, 2016 to March 15, 2018.  The initial contract amount was $320,997.  The contract imposed various obligation upon iFOS, including the following:

a.    under FAR 52.232-7(a)(5), incorporated by reference into the contract by reference, to substantive vouchers by individual daily job timekeeping records and verify that the employees met the qualifications for the labor categories in the contract; and

b.    under § H 4.0 "All contractor and subcontractor personnel are required to complete a suitability/background investigation with the DHS Office of Security, Personnel Security Division.

46.    Only the DHS Contracting Officer responsible for contract No. HSHQDC-16-C-00040 had authority to waive the requirement concerning suitability background investigations contained in contract No. HSHQDC-16-C-00040, and the DHS Contracting Officer never provided any such waiver relating to contract No. HSHQDC-16-C-00040.

47.    Dr. Buck never submitted to a mandatory suitability background investigation during the period for which he provided services under the iFOS contract.  The United States alleges, upon information and belief, that Dr. Buck was concerned that he would not pass the mandatory suitability background investigation conducted by the DHS Office of Security, Personnel Security Division.

48.    On March 17, 2016, iFOS prepared a subcontract agreement with Dr. Buck and his limited liability company, Transformation Systems International, LLC (TSI).  The agreement between iFOS and TSI expressly referenced the iFOS DHS contract by number:  "This Agreement is issued under the terms and conditions of the U.S. Government Prime Contract No. HSHQDC-16-C-00040 between iFOS and the U.S. Department of Homeland Security (DHS), Washington, DC."

49.    From March 2016 to at least July 2017, iFOS, Ms. Smith, and others took affirmative steps to hide Dr. Buck's participation in the DHS contact from DHS contracting

personnel at DHS OPO including by: (a) submitting false invoices to DHS showing Dr. Buck's time as performed by iFOS employee B.A.S. while keeping another internal set of time records for Dr. Buck's time that was used calculate compensation owed to Dr. Buck; (b) funneling of Dr. Buck's communications with the Deputy Director through the iFOS email accounts of other iFOS personnel so other DHS personnel would not know about their direct contact; (c) creating an email account for Dr. Buck with an address (dhs0040@ifos.com) that was substantially similar to the group project account (dhs00040@ifoscorp.com); (d) allowing Dr. Buck to use the group project email account to communicate directly with the Deputy Director using coded messages that BAS and others at iFOS were aware of and understood; and (e) permitting Dr. Buck to work on the DHS contract without completing a DHS mandatory suitability background investigation.

50.     On March 21, 2016, a post-award conference between iFOS and DHS contracting personnel was held.  While the role of the Strategic Advisor was discussed, Dr. Buck's name was never mentioned.  The only DHS employee who was aware of Dr. Buck's involvement with iFOS and on the contract was the Deputy Director.

51.     On March 22, 2016, Dr. Buck emailed iFOS personnel about the timing of the work to be done under the contract.  He was informed that nothing would happen on the contract until the security paperwork, which included the background investigations, was done.

52.     On March 24, 2016, iFOS set up a group email account – dhs00040@ifoscorp.com – to which B.A.S., Dr. Buck, Ms. Smith, and K.F., as well as other iFOS employees working on the DHS contract, had access.  Ms. Smith authorized the creation of this account by iFOS employees.  Emails sent by B.A.S. on this group email account included a

signature block with his name.  Emails send by Dr. Buck on this group email account did not include a signature block that identified him by name.

53.    Even after the iFOS contract was awarded, the issue of the mandatory suitability background investigation was a subject of concern at iFOS.  On April 4, 2016, Dr. Buck emailed iFOS personnel asking: "Let me know if you have heard anything about the suitability review."

54.    On April 11, 2016, iFOS entered into a Consulting/Subcontracting Agreement with TSI and Dr. Buck.  Ms. Smith updated that agreement prior to it being sent to Dr. Buck and met with him, B.A.S. and K.F. on that day to review the DHS contact including the following topics: "*Subcontracting agreement * PMO Roles and Responsibilities * Project Structure and Email coordination * Project Coordination and Limitation Requirements * Project Invoices and Monthly Reporting Requirements."

55.    Later that same day, B.A.S. sent Dr. Buck an email explaining how to log into the iFOS time sheet program called the "User Time Grid by Day."  Dr. Buck's name on the iFOS time records for the DHS contract was "CLIN1001 SMA TSI LLC KBUCK."  In this heading, "CLIN1001" referred to the contract line item in the iFOS contract, "SMA" referred to Subject Matter Advisor, "TSI" was Dr. Buck's corporation, and "KBuck" referred to his name.  iFOS used the records kept in its timesheet program to calculate compensation owed to Dr. Buck. From May 2016 through June 2017, these records did not match the invoices that were submitted to DHS, which showed no time billed by Dr. Buck or his company, TSI.  Rather, the time sheets submitted to iFOS by Dr. Buck were nearly identical to the time billed under B.A.S.' name on the time records submitted with iFOS' invoices to DHS.

56.    Nearly all of the hours billed to DHS under B.A.S.' name from April to December 2016 were for work performed by Dr. Buck.  A comparison of iFOS' invoices submitted to DHS

for B.A.S.' time (purple bars in the chart below) with Dr. Buck's iFOS time sheets (dark green

bars) from April to December 2016 show that these hours are nearly identical.  A similar

comparison of iFOS' invoices submitted to DHS for B.A.S.' time (purple bars) with iFOS'

payments to Dr. Buck divided by his applicable billable rate (dark green bars) made a month

later from January to May 2017 are similarly nearly identical.  Beginning in May 2017, iFOS

directly billed DHS for Dr. Buck's time (light green bars) either under his name or the name of

his company, TSI.  Once iFOS began invoicing DHS directly for Dr. Buck's time upon the

conclusion of his one-year cooling off period, iFOS' billing for B.A.S. dropped to *de minimis*

amounts.  From April 2016 to May 2017, iFOS invoiced DHS for an average of 65 hours per

month for B.A.S.' time.  From June to December 2017, when iFOS began billing DHS directly

for Dr. Buck's time, iFOS invoiced DHS an average of 1.5 hours per month, approximately 2.4%

of his previous monthly billings, for B.A.S.' time.  Conversely, from June to December 2017,

iFOS billed DHS an average of 41 hours per month for Dr. Buck's time.



57.     In February 2016, Dr. Buck had requested iFOS pay him $200 per hour for his work on the DHS contract.  iFOS paid Dr. Buck an additional $10 per hour as a bonus for his role in helping iFOS obtain the contract.  On April 15, 2016, K.F. emailed Dr. Buck: "Good morning Ken, just wanted to let you know that the salary for is [sic] $210 [per hour]".  The additional is a thank you for the business."  "[T]he business" referred to was the OUSM contract. Ms. Smith approved the pay increase to Dr. Buck.

58.     On April 15, 2016, the iFOS-OUSM Project Kickoff Meeting was held.  Present at the meeting were the Deputy Director, other DHS employees, and K.F. and B.A.S. on behalf of iFOS.  Among the issues discussed was the role of the Strategic Advisor and the deliverable items; however, there was no discussion of Dr. Buck's involvement or his failure to complete the mandatory background suitability investigation.  Only the Deputy Director and the iFOS personnel were aware of Dr. Buck's involvement on the iFOS contract.

59.     On April 21, 2016, the Deputy Director and Dr. Buck exchanged seven text messages.  The following day, on April 22, 2016, the Deputy Director emailed DHS0040@ifoscorp.com another request for "Strategic Advisor level review" and comment on a fourteen-page Unity of Effort document.  The DHS0040@ifsocorp.com email address was a group email address which was received and used by both B.A.S. and Dr. Buck.  Using this email account that did not identify him by name, Dr. Buck provided the Deputy Director with a cover letter and comments on the fourteen-page document.  In connection with further editing of these documents, on April 27, 2016, Dr. Buck emailed B.A.S. writing: "PLEASE MAKE SURE my name is not in the 'author' section.  I believe I replaced my name with the initials 'BS.'" (emphasis original).  "BS" referred to iFOS employee B.A.S.  While only the Deputy Director at DHS knew of Dr. Buck's surreptitious work on the contract in violation of federal conflict-of—

interest rules and despite not completing the mandatory suitability background investigation, iFOS personnel were well aware of it and were told not to disclose his involvement to others at DHS.

60.     iFOS and Ms. Smith knew that the hours for both Dr. Buck and B.A.S. would be invoiced to DHS under the B.A.S.' name as the purported Strategic Advisor.  On April 28, 2016, Dr. Buck and B.A.S. discussed billing for the OUSM contract.  On April 29, 2016, Dr. Buck emailed B.A.S. for clarification as to "[h]ow many hours each month do you feel you will allocated against the strategic advisor position?"  B.A.S. responded that it "[s]hould be no more than 5-10 hours per month."

61.     In April 2016, Dr. Buck, using iFOS' electronic timesheet program, billed 20 hours to the DHS contract as Strategic Advisor.

62.     On April 29, 2016, iFOS submitted invoice no. 0001 and supporting paperwork to DHS for the period of April 1-30, 2016 claiming payment for $4,700.00, which included 20 hours at $235.00 per hour solely for the time of B.A.S.  This invoice was signed by Ms. Smith. This invoice and supporting paperwork falsely stated that B.A.S. performed all of the work as the Strategic Advisor, and the invoice concealed the material fact that Dr. Buck actually performed that work.  The bulk of the hours allocated to B.A.S. were for work actually performed by Dr. Buck, making this invoice a false claim for payment.  Additionally, this invoice and supporting paperwork failed to disclose (a) the actions of Dr. Buck and others in assisting iFOS in obtaining the OUSM contract; (b) Dr. Buck's extensive direct communications with the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c) iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background investigation despite agreeing to do so in the contract.  DHS paid this invoice soon after receipt.

63.      On May 2, 2016, the Deputy Director sent several emails to dhs00040@ifoscorp.com, the iFOS group email account, asking for "Strategic Advisor level assistance" and "Strategic Advisor situational awareness."  The Deputy Director and B.A.S. understood these were requests for Dr. Buck to work on the contract.  On that day, the Deputy Director and Dr. Buck spent 13 minutes talking on the telephone.

64.      iFOS employees were aware that Dr. Buck was in direct contact with the Deputy Director and that he was surreptitiously serving as the Strategic Advisor in violation of federal conflict-of-interest rules and despite not completing the mandatory suitability background investigation.  Not only did Dr. Buck tell them so, they were copied on email correspondence between the Deputy Director and Dr. Buck.  On May 3, 2016, the Deputy Director emailed Dr. Buck in connection with the iFOS contract.  The Deputy Director responded to DHS00040@ifoscorp.com, the iFOS group email account, concerning an "Issue Paper for Deputy Secretary's HSGAC [Senate Homeland Security and Governmental Affairs Committee] Hearing."  She copied B.A.S., K.F. and Dr. Buck's personal email address.  The original message that the Deputy Director received was from DHS00040, the group email account, was addressed to "[B.A.S.]," signed "Strategic Advisor" and was copied to B.A.S., K.F., and Dr. Buck's personal email address.  This email made it clear that B.A.S. and the Strategic Advisor were two different people.  On this day, Dr. Buck spoke with the Deputy Director for over 15 minutes by telephone and they exchanged 14 text messages.

65.      During the first year of the contract, Dr. Buck continued to provide iFOS with non-public, internal DHS information.  On May 5, 2016, Dr. Buck emailed B.A.S. saying: "I have a sense there may be a 60-90 minute conference call scheduled w/ DHS to get them some prep materials for the upcoming kickoff meeting with the LOGs to launch the GAO initiative.

No time scheduled yet.  . . .   Better that I come into your conference room and participate as a silent advisor and feed you, any questions."  B.A.S. responds that he had not seen anything from DHS yet.  The purpose of Dr. Buck participating as a "silent advisor" to "feed" questions to B.A.S. was to hide his involvement on the contract from other DHS employees who might notify the DHS contracting personnel.

66.     On May 6, 2016, iFOS and DHS had the planned conference call.  Dr. Buck participated in the May 6, 2016 conference call as a "silent advisor."  The same day, Dr. Buck and the Deputy Director exchanged 2 text messages at 11:57 a.m. which was during or just after the conclusion of the conference call.

67.     iFOS assigned Dr. Buck an additional email account –dhs0040@ifos.com – which showed the name "Strategic Advisor" which he began using in June 2016.  This email was substantially similar to the group iFOS email account for the contract – dhs000040@ifoscorp.com.  Specifically, this email contained 1 fewer zero and was at the ifos.com domain:

          dhs**0**0040@ifos**corp**.com      iFOS group email address

               dhs0040@ifos.com       Dr. Buck personal iFOS email address

The similarity of these two email addresses allowed the Deputy Director and Dr. Buck's direct contacts to hide in plain sight.  All emails bearing the name "Strategic Advisor" came from, or were received by, Dr. Buck.  B.A.S., iFOS' purported Strategic Advisor, never had access to the Strategic Advisor email account.  Dr. Buck also had access to all emails sent on dhs00040@ifoscorp.com, the group account.

68.     iFOS personnel, including B.A.S., funneled communications and documents from Dr. Buck to DHS employees to conceal his participation on the contract in violation of federal conflict-of-interest rules and without completing the suitability background investigation.

69.     Throughout the one-year period following Dr. Buck's separation from DHS, iFOS employee B.A.S. funneled messages between Dr. Buck and the Deputy Director, while Dr. Buck and the Deputy Director also maintained direct contact via text message and telephone calls made from personal devices and Dr. Buck's personal iFOS email account.   The volume of direct contacts via text or telephone increased at times of increased iFOS-DHS contractual activities and email funneling by B.A.S.  Compare the charts in Paragraphs 148 and 149 (showing the volume of personal telephone calls and text messages with the chart in Paragraph 59 showing hours bills by the "Strategic Advisor."

70.     Dr. Buck knew that the one-year cooling off period precluded him from participating in the iFOS-DHS contract and informed iFOS personnel about this limitation.  On May 19, 2016, B.A.S. emailed Dr. Buck about participating on a United States Coast Guard contract.  Dr. Buck responded: "Sure.  You know that the one year restriction applies for any DHS component, right?"

71.     On May 23, 2016, iFOS paid $4,200 to Dr. Buck in whole or in part for his services on the DHS contract.  Ms. Smith approved the payment to Dr. Buck and his company, TSI.  In the case of this specific invoice, she approved the early payment of this invoice at the request of B.A.S.  iFOS used the records kept in its timesheet program, not the invoices submitted to the Government, to pay Dr. Buck.  The Government invoices showed no time billed by Dr. Buck or TSI.

72.    On May 24, 2016, Dr. Buck emailed B.A.S. a draft opening statement for a Homeland Security and Government Accountability Committee Roundtable saying, "I think I have removed my prints."  B.A.S. later forwarded this document to DHS personnel.

73.    In May 2016, Dr. Buck, using iFOS' electronic timesheet program, billed 87 hours to the DHS contract.

74.    On May 31, 2016, iFOS submitted invoice no. 0002 and supporting paperwork to DHS for the period of May 1-31, 2016 claiming payment for $23,090.40, which included 85 hours at $235.00 per hour solely for the time of B.A.S.  This invoice was signed by Ms. Smith. This invoice and supporting paperwork falsely stated that B.A.S. performed all of the work as the Strategic Advisor, and the invoice concealed the material fact that Dr. Buck actually performed that work.  The bulk of the hours allocated to B.A.S. were for work actually performed by Dr. Buck, making this invoice a false claim for payment.  Additionally, this invoice and supporting paperwork failed to disclose (a) the actions of Dr. Buck and others in assisting iFOS in obtaining the OUSM contract; (b) Dr. Buck's extensive direct communications with the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c) iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background investigation despite agreeing to do so in the contract.  DHS paid this invoice soon after receipt.

75.    On July 1, 2016, iFOS paid $17,850 to Dr. Buck in whole or in part for his services on the DHS contract.  Ms. Smith approved the payment to Dr. Buck and his company, TSI.  iFOS used the records kept in its timesheet program, not the invoices submitted to the Government, to pay Dr. Buck.  The Government invoices showed no time billed by Dr. Buck or TSI.

76.     On June 30, 3016, iFOS submitted invoice no. 0003 and supporting paperwork to DHS for the period of June 1-30, 2016 claiming payment for $30,014.41, which included 62 hours at $235.00 per hour solely for the time of B.A.S.  This invoice was signed by Ms. Smith.  This invoice and supporting paperwork falsely stated that B.A.S. performed all of the work as the Strategic Advisor, and the invoice concealed the material fact that Dr. Buck actually performed that work.  The bulk of the hours allocated to B.A.S. were for work actually performed by Dr. Buck, making this invoice a false claim for payment.  Additionally, this invoice and supporting paperwork failed to disclose (a) the actions of Dr. Buck and others in assisting iFOS in obtaining the OUSM contract; (b) Dr. Buck's extensive direct communications with the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c) iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background investigation despite agreeing to do so in the contract.  DHS paid this invoice soon after receipt.

77.     In June 2016, Dr. Buck, using iFOS' electronic timesheet program, billed 62 hours.

78.     On July 29. 2016, iFOS paid $9,450 to Dr. Buck in whole or in part for his services on the DHS contract.  Ms. Smith approved the payment to Dr. Buck and TSI, his company.  iFOS used the records kept in its timesheet program, not the invoices submitted to the Government, to pay Dr. Buck.  The Government invoices showed no time billed by Dr. Buck or TSI.

79.     In July 2016, Dr. Buck, using iFOS' electronic timesheet program, billed 85 hours.

80.     On July 29, 2016, iFOS submitted invoice no. 0004 and supporting paperwork to DHS for the period of July 1-29, 2016 claiming payment for $43,787.94, which included 85

hours at $235.00 per hour solely for the time of BAS.  This invoice was signed by Ms. Smith.

This invoice and supporting paperwork falsely stated that B.A.S. performed all of the work as the

Strategic Advisor, and the invoice concealed the material fact that Dr. Buck actually performed

that work.  The bulk of the hours allocated to B.A.S. were for work actually performed by Dr.

Buck, making this invoice a false claim for payment.  Additionally, this invoice and supporting

paperwork failed to disclose (a) the actions of Dr. Buck and others in assisting iFOS in obtaining

the OUSM contract; (b) Dr. Buck's extensive direct communications with the Deputy Director in

violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c) iFOS' intention not to

submit Dr. Buck's name for a mandatory suitability background investigation despite agreeing to

do so in the contract.  DHS paid this invoice soon after receipt.

81.     On August 10, 2016, Dr. Buck sent an email from dhs0040@ifoscorp.com to

B.A.S. and the Deputy Director at her personal gmail account: "[B.A.S.] - can you please try to

re-send this document to the SharePoint Drive?  I'm not sure the responses to [the Deputy

Director's]'s two comments made it through.  Please make sure the comments appear as Strategic

Advisor.  Thanks SA."

82.     On August 12, 2016, iFOS paid $3,570 to Dr. Buck in whole or in part for his

services on the DHS contract.  Ms. Smith approved the payment to Dr. Buck and TSI, his

company.  iFOS used the records kept in its timesheet program, not the invoices submitted to the

Government, to pay Dr. Buck.  The Government invoices showed no time billed by Dr. Buck or

TSI.

83.     In August 2016, Dr. Buck, using iFOS' electronic timesheet program, billed 83

hours.

84.     On August 31, 2016, iFOS submitted invoice no. 0005 and supporting paperwork to DHS for the period of August 1-31, 2016 claiming payment for $36,007.80, which included 83 hours at $235.00 per hour solely for the time of BAS.  This invoice was signed by Ms. Smith. This invoice and supporting paperwork falsely stated that B.A.S. performed all of the work as the Strategic Advisor, and the invoice concealed the material fact that Dr. Buck actually performed that work.  The bulk of the hours allocated to B.A.S. were for work actually performed by Dr. Buck, making this invoice a false claim for payment.  Additionally, this invoice and supporting paperwork failed to disclose (a) the actions of Dr. Buck and others in assisting iFOS in obtaining the OUSM contract; (b) Dr. Buck's extensive direct communications with the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c) iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background investigation despite agreeing to do so in the contract.  DHS paid this invoice soon after receipt.

85.     During the month of August 2016, Dr. Buck and the Deputy Director spent over 4 hours talking on the telephone and exchanged over 40 text messages, including 4 texts on September 1, 2016.  On September 1, 2016, DHS issued Modification #1 to the iFOS contract adding $106,897 to the contract amount.  Ms. Smith discussed the funding under the Modification with DHS personnel and iFOS personnel.

86.     On September 6, 2016, iFOS paid $17,010 to Dr. Buck in whole or in part for his services on the DHS contract.  Ms. Smith approved the payment o to Dr. Buck and TSI, his company.  iFOS used the records kept in its timesheet program, not the invoices submitted to the Government, to pay Dr. Buck.  The Government invoices showed no time billed by Dr. Buck or TSI.

87.     In September 2016, Dr. Buck, using iFOS' electronic timesheet program, billed 27 hours.

88.     On September 30, 2016, iFOS submitted invoice no. 0006 and supporting paperwork to DHS for the period of September 1-30, 2016 claiming payment for $20,315.76, which included 29 hours at $235.00 per hour solely for the time of BAS.  This invoice was signed by Ms. Smith.  This invoice and supporting paperwork falsely stated that B.A.S. performed all of the work as the Strategic Advisor, and the invoice concealed the material fact that Dr. Buck actually performed that work.  The bulk of the hours allocated to B.A.S. were for work actually performed by Dr. Buck, making this invoice a false claim for payment. Additionally, this invoice and supporting paperwork failed to disclose (a) the actions of Dr. Buck and others in assisting iFOS in obtaining the OUSM contract; (b) Dr. Buck's extensive direct communications with the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c) iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background investigation despite agreeing to do so in the contract.  DHS paid this invoice soon after receipt.

89.     On October 3, 2016, iFOS paid $17,430 to Dr. Buck in whole or in part for his services on the DHS contract.  Ms. Smith approved the payment to Dr. Buck and TSI, his company.  iFOS used the records kept in its timesheet program, not the invoices submitted to the Government, to pay Dr. Buck.  The Government invoices showed no time billed by Dr. Buck or TSI.

90.     In October 2016, Dr. Buck, using iFOS' electronic timesheet program, billed 58 hours.

91.     On October 31, 2016, iFOS submitted invoice no. 0007 and supporting paperwork to DHS for the period of October 1-31, 2016 claiming payment for $28,035.94, which included 58 hours at $235.00 per hour solely for the time of BAS.  This invoice was signed by Ms. Smith. This invoice and supporting paperwork falsely stated that B.A.S. performed all of the work as the Strategic Advisor, and the invoice concealed the material fact that Dr. Buck actually performed that work.  The bulk of the hours allocated to B.A.S. were for work actually performed by Dr. Buck, making this invoice a false claim for payment.  Additionally, this invoice and supporting paperwork failed to disclose (a) the actions of Dr. Buck and others in assisting iFOS in obtaining the OUSM contract; (b) Dr. Buck's extensive direct communications with the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c) iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background investigation despite agreeing to do so in the contract.  DHS paid this invoice soon after receipt.

92.     On November 1, 2016, iFOS paid $5,670 to Dr. Buck in whole or in part for his services on the DHS contract.  Ms. Smith approved the payment to Dr. Buck and TSI, his company.  iFOS used the records kept in its timesheet program, not the invoices submitted to the Government, to pay Dr. Buck.  The Government invoices showed no time billed by Dr. Buck or TSI.

93.     iFOS and Ms. Smith were aware that Dr. Buck's time was being billed to DHS under B.A.S.'s name.  On November 7, 2016, B.A.S. and K.F. discussed Dr. Schwartz's 422 hours on the DHS contract.  K.F. asked him if all of the hours were "just for Ken."  B.A.S. responded "yes, those are all hours charged to the Senior Management Advisor CLIN [contract line item number]."

94.     In November 2016, Dr. Buck, using iFOS' electronic timesheet program, billed 51 hours.

95.     On November 30, 2016, iFOS submitted invoice no. 0008 and supporting paperwork to DHS for the period of November1-30, 2016 claiming payment for $25,949.04, which included 51 hours at $235.00 per hour solely for the time of BAS.  This invoice was signed by Ms. Smith.  This invoice and supporting paperwork falsely stated that B.A.S. performed all of the work as the Strategic Advisor, and the invoice concealed the material fact that Dr. Buck actually performed that work.  The bulk of the hours allocated to B.A.S. were for work actually performed by Dr. Buck, making this invoice a false claim for payment. Additionally, this invoice and supporting paperwork failed to disclose (a) the actions of Dr. Buck and others in assisting iFOS in obtaining the OUSM contract; (b) Dr. Buck's extensive direct communications with the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c) iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background investigation despite agreeing to do so in the contract.  DHS paid this invoice soon after receipt.

96.     On December 1, 2016, iFOS paid $12,180 to Dr. Buck in whole or in part for his services on the DHS contract.  Ms. Smith approved the payment to Dr. Buck and TSI, his company.  iFOS used the records kept in its timesheet program, not the invoices submitted to the Government, to pay Dr. Buck.  The Government invoices showed no time billed by Dr. Buck or TSI.

97.     On December 4, 2016, the Deputy Director emailed Dr. Buck on one of his personal email accounts about changes he had made on an iFOS document submitted to DHS under the OUSM contract.  The Deputy Director stated:  "Thank you!  . . .  Can you have

[B.A.S.] send this to me clean, on DHS account, very first thing in morning (assuming he is not working tonight). As early as he can in a.m." Dr. Buck then forwards the document to B.A.S. to send it to DHS from B.A.S.' email account.

98.     In December 2016, Dr. Buck, using iFOS' electronic timesheet program, billed 57 hours.

99.     On December 30, 2016, iFOS submitted invoice no. 0009 and supporting paperwork to DHS for the period of December1-30, 2016 claiming payment for $25,414.68, which included 57 hours at $235.00 per hour solely for the time of BAS. This invoice was signed by Ms. Smith. This invoice and supporting paperwork falsely stated that BAS performed all of the work as the Strategic Advisor and did not disclose that Dr. Buck actually performed that work. The bulk of the hours allocated to BAS were for work actually performed by Dr. Buck, making this invoice a false claim for payment. Additionally, this invoice and supporting paperwork did not disclose the actions of Dr. Buck and others in assisting iFOS in obtaining the OUSM contract or iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background investigation despite agreeing to do so in the contract. DHS paid this invoice soon after receipt.

100.     In 2016, iFOS paid Buck and TSI $87,360 in non-employee compensation. iFOS used the records kept in its timesheet program, not the invoices submitted to the Government, to pay Dr. Buck. The Government invoices showed no time billed by Dr. Buck or TSI.

101.     On January 4, 2017, iFOS paid $10,710 to Dr. Buck in whole or in part for his services on the DHS contract. Ms. Smith approved the payment to Dr. Buck and TSI, his company. iFOS used the records kept in its timesheet program, not the invoices submitted to the

Government, to pay Dr. Buck.  The Government invoices showed no time billed by Dr. Buck or TSI.

102.     On January 5, 2017, DHS issued Modification #2 to the iFOS-OUSM contract realigning funding and hours.  The stated purpose of this modification was to realign hours for a Strategic Management Advisor.  The next day. Ms. Smith informed DHS that all contract administration tasks should be directed exclusively to her attention.  Five days later, iFOS sent an email to Dr. Buck stating: "Attached is the addendum to your subcontracting agreement based on the increase of hours."

103.     By January 7, 2017, Dr. Buck became concerned that his involvement with the contract would be discovered by DHS contracting personnel.  On that day, Dr. Buck emailed the Deputy Director, B.A.S. and another DHS employee from his iFOS email address, which now showed "Kenneth Buck <dhs00040@ifoscorp.com>."

104.     At 5:20 p.m., the Deputy Director noticed Dr. Buck's mistake and texted him: "You replied to my work account email today.  At 5:21 p.m., Dr. Buck responded "Was my name on it or was it from the iFOS box?"  At 5:53 p.m., the Deputy Director instructed Dr. Buck, "Loop in [B.A.S.] to which Dr. Buck responded "Already done."  At 6:49 p.m., Dr. Buck sent the Deputy Director a text which read: "I just spoke with [B.A.S.].  , , , He just wants to make sure you and he are in accord.  One option if anyone asks him is to say that I've advised them on a few issues and now the one year cooling off period is over, I'm just laying low."  The Deputy Director and Dr. Buck, as well as B.A.S., knew that Dr. Buck's proposed response was false and that Dr. Buck had served surreptitiously as the Strategic Advisor on the iFOS contract during his one-year cooling off period and without completing the mandatory suitability background investigation.

105.    On January 10, 2017, B.A.S. emailed Dr. Buck that there would be an addendum to his subcontracting agreement with iFOS to increase his pay based on DHS' increase of the hours on the contract.

106.    After the expiration for Dr. Buck's one-year cooling off period, from January 9, 2017 to the conclusion of the contract on December 31, 2017, Dr. Buck and the Deputy Director spoke using Dr. Buck's telephone over 180 times for a total of over 43 combined hours.  The vast bulk of these calls were during business hours, and multiple calls often were made on the same day.  The United States alleges, on information and belief, that many, if not all, of these calls related to the iFOS contract with DHS.  At no point after the conclusion of Dr. Buck's cooling off period, did iFOS identify Dr. Buck for purposes of completing the mandatory suitability background investigation.

107.    On January 31, 2017, iFOS submitted invoice no. H0010 and supporting paperwork to DHS for the period of January 1-31, 2017 claiming payment for $28,240.80, which included 60 hours at $235.00 per hour solely for the time of BAS.  This invoice was signed by Ms. Smith.  This invoice and supporting paperwork falsely stated that B.A.S. performed all of the work as the Strategic Advisor, and the invoice concealed the material fact that Dr. Buck actually performed that work.  The bulk of the hours allocated to B.A.S. were for work actually performed by Dr. Buck, making this invoice a false claim for payment.  Additionally, this invoice and supporting paperwork failed to disclose (a) the actions of Dr. Buck and others in assisting iFOS in obtaining the OUSM contract; (b) Dr. Buck's extensive direct communications with the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c) iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background investigation despite agreeing to do so in the contract.  DHS paid this invoice soon after receipt.

- 34 -

108.     On February 3, 2017, iFOS paid $11,970 to Dr. Buck in whole or in part for his services on the DHS contract.  Ms. Smith approved the payment to Dr. Buck and TSI, his company.  iFOS used the records kept in its timesheet program, not the invoices submitted to the Government, to pay Dr. Buck.  The Government invoices showed no time billed by Dr. Buck or TSI.

109.     On February 28, 2017, iFOS submitted invoice no. H0011 and supporting paperwork to DHS for the period of February 1-28, 2017 claiming payment for $34,818.76, which included 91 hours at $235.00 per hour solely for the time of BAS.  This invoice was signed by Ms. Smith.  This invoice and supporting paperwork falsely stated that B.A.S. performed all of the work as the Strategic Advisor, and the invoice concealed the material fact that Dr. Buck actually performed that work.  The bulk of the hours allocated to B.A.S. were for work actually performed by Dr. Buck, making this invoice a false claim for payment. Additionally, this invoice and supporting paperwork failed to disclose (a) the actions of Dr. Buck and others in assisting iFOS in obtaining the OUSM contract; (b) Dr. Buck's previous extensive direct communications with the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c) iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background investigation despite agreeing to do so in the contract.  DHS paid this invoice soon after receipt.

110.     On March 1, 2017, iFOS paid $12,180 to Dr. Buck in whole or in part for his services on the DHS contract.  Ms. Smith approved the payment to Dr. Buck and TSI, his company.  iFOS used the records kept in its timesheet program, not the invoices submitted to the Government, to pay Dr. Buck.  The Government invoices showed no time billed by Dr. Buck or TSI.

111.    On March 16, 2017, DHS issued Modification #3 to the iFOS –DHS contract which exercised the one year extension option and increased total contract amount by $360,122.

112.    On March 19, 2017, BAS emailed Dr. Buck about an increase to his hourly rate and to thank Dr. Buck for all of the work he put in over this past year.

113.    On March 31, 2017, iFOS submitted invoice no. H0012 and supporting paperwork to DHS for the period of March 1-31, 2017 claiming payment for $43,973.72, which included 88 hours at $235.00 per hour and 28 hours at $242.05 solely for the time of BAS.  This invoice was signed by Ms. Smith.  This invoice and supporting paperwork falsely stated that B.A.S. performed all of the work as the Strategic Advisor, and the invoice concealed the material fact that Dr. Buck actually performed that work.  The bulk of the hours allocated to B.A.S. were for work actually performed by Dr. Buck, making this invoice a false claim for payment.  Additionally, this invoice and supporting paperwork failed to disclose (a) the actions of the Dr. Buck and others in assisting iFOS in obtaining the OUSM contract; (b) Dr. Buck's previous extensive direct communications with the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c) iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background investigation despite agreeing to do so in the contract.  DHS paid this invoice soon after receipt.

114.    On April 3, 2017, iFOS paid $13,020 to Dr. Buck in whole or in part for his services on the DHS contract.  Ms. Smith approved the payment to Dr. Buck and TSI, his company.  iFOS used the records kept in its timesheet program, not the invoices submitted to the Government, to pay Dr. Buck.  The Government invoices showed no time billed by Dr. Buck or TSI.

115.    On April 30, 2017, iFOS submitted invoice no. H0013 and supporting paperwork to DHS for the period of April1-30, 2017 claiming payment for $29,329.85, which included 61 hours at $242.05 per hour solely for the time of BAS.  This invoice was signed by Ms. Smith. This invoice and supporting paperwork falsely stated that B.A.S. performed all of the work as the Strategic Advisor, and the invoice concealed the material fact that Dr. Buck actually performed that work.  The bulk of the hours allocated to B.A.S. were for work actually performed by Dr. Buck, making this invoice a false claim for payment.  Additionally, this invoice and supporting paperwork failed to disclose (a) the actions of Dr. Buck and others in assisting iFOS in obtaining the OUSM contract; (b) Dr. Buck's previous extensive direct communications with the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c) iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background investigation despite agreeing to do so in the contract.  DHS paid this invoice soon after receipt.

116.    On May 2, 2017, iFOS paid $16,450 to Dr. Buck in whole or in part for his services on the DHS contract.  Ms. Smith approved the payment to Dr. Buck and TSI, his company.  iFOS used the records kept in its timesheet program, not the invoices submitted to the Government, to pay Dr. Buck.  The Government invoices showed no time billed by Dr. Buck or TSI.

117.    On May 31, 2017, iFOS submitted invoice no. H0014 and supporting paperwork to DHS for the period of May 1-31, 2017 claiming payment for $29,060.94, which included 55 hours at $242.05 per hour solely for the time of BAS. This invoice was signed by Ms. Smith. This invoice and supporting paperwork falsely stated that B.A.S. performed all of the work as the Strategic Advisor, and the invoice concealed the material fact that Dr. Buck actually performed that work.  The bulk of the hours allocated to B.A.S. were for work actually performed by Dr.

Buck, making this invoice a false claim for payment.  Additionally, this invoice and supporting paperwork failed to disclose (a) the actions of Dr. Buck and others in assisting iFOS in obtaining the OUSM contract; (b) Dr. Buck's previous extensive direct communications with the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c) iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background investigation despite agreeing to do so in the contract.  DHS paid this invoice soon after receipt.

118.    On June 2, 2017, iFOS paid $13,420 to Dr. Buck in whole or in part for his services on the DHS contract.  Ms. Smith approved the payment to Dr. Buck and TSI, his company.  iFOS used the records kept in its timesheet program, not the invoices submitted to the Government, to pay Dr. Buck.  The Government invoices showed no time billed by Dr. Buck or TSI.

119.    On June 30, 2017, iFOS submitted invoice no. H0015 to DHS for the period of June 1-30, 2017 claiming payment for $19,167.93, which included 2 hours at $242.05 per hour for the time of BAS and 11 hours at $242.05 for $2,662.55 for Dr. Buck's company, TSI.  This invoice was signed by Ms. Smith.  This invoice and supporting paperwork failed to disclose (a) the actions of Dr. Buck and others in assisting iFOS in obtaining the OUSM contract; (b) Dr. Buck's previous extensive direct communications with the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c) iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background investigation despite agreeing to do so in the contract.  DHS paid this invoice soon after receipt.

120.    On July 3, 2017, iFOS paid $12,100 to Dr. Buck in whole or in part for his services on the DHS contract.  Ms. Smith approved the payment to Dr. Buck and TSI, his company.  iFOS used the records kept in its timesheet program, not the invoices submitted to the

Government, to pay Dr. Buck.  The Government invoices showed no time billed by Dr. Buck or TSI.

121.    On July 3, 2017, a DHS employee emailed iFOS about new line item for TSI on invoices asking if TSI "refers to strategic advisory services provided by Dr. Ken Buck" and for what the hours were used.  Among the iFOS accounts to which the DHS employee sent this inquiry was dhs00040@ifoscorp.com, the group email account that was used by Dr. Buck, B.A.S., and Ms. Smith.  The same day, iFOS responded to the DHS employee confirming that TSI refers to the services provided by Ken Buck.

122.    On July 30, 2017, iFOS submitted invoice no. H0016 and supporting paperwork to DHS for the period of July 1-31, 2017 claiming payment for $26,450.08, which included 1.5 hours at $242.05 per hour for the time of BAS and 46 hours at $242.05 per hour for the time of TSI-SMEKBuck.  This invoice was signed by Ms. Smith.  This was the first invoice that disclosed the involvement of Dr. Buck by name.  This invoice and supporting paperwork failed to disclose (a) the actions of Dr. Buck and others in assisting iFOS in obtaining the OUSM contract; (b) Dr. Buck's previous extensive direct communications with the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c) iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background investigation despite agreeing to do so in the contract.  DHS paid this invoice soon after receipt.

123.    On July 31, 2017, iFOS paid $2.420 to Dr. Buck in whole or in part for his services on the DHS contract. Ms. Smith approved the payment to Dr. Buck and TSI, his company.

124.    On August 31, 2017, iFOS submitted invoice no. H0017 and supporting paperwork to DHS for the period of August 1-31, 2017 claiming payment for $38,080.39, which

included 1 hour at $242.05 per hour for the time of BAS and 87 hours at $242.05 per hour for the time of TSI-SMEKBuck. This invoice was signed by Ms. Smith. This invoice and supporting paperwork failed to disclose (a) the actions of Dr. Buck and others in assisting iFOS in obtaining the OUSM contract; (b) Dr. Buck's previous extensive direct communications with the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c) iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background investigation despite agreeing to do so in the contract. DHS paid this invoice soon after receipt.

125. On August 31, 2017, iFOS paid $19,140 to Dr. Buck in whole or in part for his services on the DHS contract. Ms. Smith approved the payment to Dr. Buck and TSI, his company.

126. On September 29, 2017, iFOS submitted invoice no. H0018 and supporting paperwork to DHS for the period of September 1-30, 2017 claiming payment for $28,979.70, which included 47 hours at $242.05 per hour for the time of TSI-SMEKBuck. This invoice was signed by Ms. Smith. This invoice and supporting paperwork failed to disclose (a) the actions of Dr. Buck and others in assisting iFOS in obtaining the OUSM contract; (b) Dr. Buck's previous extensive direct communications with the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c) iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background investigation despite agreeing to do so in the contract. DHS paid this invoice soon after receipt.

127. On October 31, 2017, iFOS submitted invoice no. H0019 and supporting paperwork to DHS for the period of October 1-31, 2017 claiming payment for $24,369.92, which included 1.5 hours at $242.05 per hour for the time of BAS and 36 hours at $242.05 per hour for the time of TSI-SMEKBuck. This invoice was signed by Ms. Smith. This invoice and

supporting paperwork failed to disclose (a) the actions of Dr. Buck and others in assisting iFOS

in obtaining the OUSM contract; (b) Dr. Buck's previous extensive direct communications with

the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c)

iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background

investigation despite agreeing to do so in the contract.  DHS paid this invoice soon after receipt.

128.    On November 1, 2017, iFOS paid $10,340 to Dr. Buck in whole or in part for his

services on the DHS contract.  Ms. Smith approved the payment to Dr. Buck and TSI, his

company.

129.    On November 30, 2017, iFOS submitted invoice no. H0020 and supporting

paperwork to DHS for the period of November 1-30, 2017 claiming payment for $21,219.09,

which included 2.5 hours at $242.05 per hour for the time of BAS and 28 hours at $242.05 per

hour for the time of TSI-SMEKBuck.  This invoice was signed by Ms. Smith.  This invoice and

supporting paperwork failed to disclose (a) the actions of Dr. Buck and others in assisting iFOS

in obtaining the OUSM contract; (b) Dr. Buck's previous extensive direct communications with

the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c)

iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background

investigation despite agreeing to do so in the contract.  DHS paid this invoice soon after receipt.

130.    On December 12, 2017, DHS contracting personnel asked Ms. Smith to provide

the names of the current iFOS personnel who supported the OUSM contract.  Ms. Smith

responded with two names – B.A.S. and B.F.; she did not provide Dr. Buck's name.

131.    On December 21, 2017, DHS contracting personnel expressly asked about "K

Buck" on iFOS' invoices and asked about his status.  That day, Ms. Smith responded that

"KBuck" was an independent contractor and claimed as "part of iFOS validation on our

consultant partnerships who are assigned to a Federal project, we obtain background checks and validate security clearances on independent consultants."  Contrary to Ms. Smith's representations and as she well knew, iFOS had not performed a background investigation on Dr. Buck.  Following this communication between Ms. Smith and DHS, DHS personnel reached out multiple times to B.A.S. and others at iFOS requesting a completed background check form for Dr. Buck.  It was never submitted.

132.    On December 29, 2017, iFOS submitted invoice no. H0021 and supporting paperwork to DHS for the period of December 1-31, 2017 claiming payment for $23,520.65, which included 2 hours at $242.05 per hour for the time of BAS and 35 hours at $242.05 per hour for the time of TSI-SMEKBuck.  This invoice was signed by Ms. Smith.  This invoice and supporting paperwork failed to disclose (a) the actions of Dr. Buck and others in assisting iFOS in obtaining the OUSM contract; (b) Dr. Buck's previous extensive direct communications with the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c) iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background investigation despite agreeing to do so in the contract.  DHS paid this invoice soon after receipt.

133.    After January 1, 2018, iFOS billed no time for Dr. Buck to the contract.  The hours invoiced for the project manager/senior advisor position dropped from nearly 50 hours per month to just over 10 hours per month.  By March 31, 2018, the contract was completed.  At that time, DHS contracting officials were unaware of Dr. Buck's role in steering the contract to iFOS or iFOS' intention not to submit Dr. Buck's name for a suitability background investigation despite agreeing to do so in the contract.

134.    Had the United States known of the false claims for payment, Dr. Buck's repeated violations of the conflict of interest provisions of the Ethics in Government Act, 18 U.S.C. §

207(c), or Dr. Buck's role in steering the contract to iFOS from which he would personally benefit financially, the United States would have terminated the contract with iFOS.

135.    In 2017, iFOS paid Dr. Buck $139,790 in miscellaneous income.

136.    On January 2, 2018, iFOS paid $6,160 to Dr. Buck in whole or in part for his services on the DHS contract.  Ms. Smith approved the payment to Dr. Buck and his company, TSI.

137.    On January 9, 2018, DHS contracting personnel emailed Ms. Smith and informed her that "The contract states that all employees working on the contract shall pass a suitability background check. The subs that you hire as independent consultants as far as the government is concerned are IFOS employees so they too must submit the 11000-25s and pass a suitability back ground check. I, as the Contracting Officer never agreed to allow anyone to work on the contract without the proper background check. Please have all employees being billed under this contract submit the 11000-25 information for DHS Security."

138.    On January 9, 2018, following DHS contracting personnel's email regarding the need for a mandatory suitability background investigation for Dr. Buck, B.A.S. emailed Ms. Smith documents from the post-award conference, including DHS' responses to iFOS' questions. He flagged question 7: Question #7 which iFOS had submitted on February 19, 2016 and which read:

> Section H, Item 4.0, pg. 10, Clarify the intent of this section applies only to contractor personnel reporting onsite to DHS is required to complete suitability/background investigation with the DHS Office of Security, Personnel Security Division. We assume the aforementioned requirement does not apply to contractor administrative personnel used within our facility to perform quality control review of project deliverables and/or technical experts used for the work effort in preparing deliverables for final submission to the COR.

B.A.S. also included DHS' February 22, 2016 response:  "The 3 named labor categories requested for this requirement will have to complete a suitability background investigation regardless of off/on-site."

139.    On January 17, 2018, DHS contracting personnel reaffirmed that iFOS' independent contractors including Dr. Buck must pass a suitability check because, *inter alia,* his work at times directly informed DHS products such as formal briefings and reports.

140.    On or about February 8, 2019, iFOS submitted invoice no. H0022 dated January 31, 2019 and supporting paperwork to DHS for the period of January 1-31, 2018 claiming payment for $15,048.90, which included 2 hours at $242.05 per hour for the time of BAS.  This invoice was signed by Ms. Smith.  This invoice was signed by Ms. Smith.  This invoice and supporting paperwork failed to disclose (a) the actions of Dr. Buck and others in assisting iFOS in obtaining the OUSM contract; (b) Dr. Buck's previous extensive direct communications with the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c) iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background investigation despite agreeing to do so in the contract.  DHS paid this invoice soon after receipt.

141.    On February 2, 2018, iFOS paid $7,770 to Dr. Buck in whole or in part for his services on the DHS contract.  Ms. Smith approved the payment to Dr. Buck and TSI, his company.

142.    On February 28, 2018, iFOS submitted invoice no. H0023 and supporting paperwork to DHS for the period of February 1-28, 2018 claiming payment for $15,893.99, which included 8.5 hours at $242.05 per hour for the time of BAS.  This invoice was signed by Ms. Smith.  This invoice and supporting paperwork failed to disclose (a) the actions of Dr. Buck and others in assisting iFOS in obtaining the OUSM contract; (b) Dr. Buck's previous extensive

direct communications with the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c) iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background investigation despite agreeing to do so in the contract.  DHS paid this invoice soon after receipt.

143.    On March 30, 2018, iFOS paid $1,500 to Dr. Buck which at $220 per hour would equal just under 7 hours of work.  Ms. Smith approved the payment to Dr. Buck and TSI, his company.

144.    On March 30, 2018, iFOS submitted invoice no. H0024 and supporting paperwork to DHS for the period of March 1-31, 2018 claiming payment for $12,851.64, which included 20 hours at $242.05 per hour for the time of BAS.  This invoice was signed by Ms. Smith.  This invoice and supporting paperwork failed to disclose (a) the actions of Dr. Buck and others in assisting iFOS in obtaining the OUSM contract; (b) Dr. Buck's previous extensive direct communications with the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); and (c) iFOS' intention not to submit Dr. Buck's name for a mandatory suitability background investigation despite agreeing to do so in the contract.  DHS paid this invoice soon after receipt.

145.    On May 4, 2018, iFOS paid $3,740, which at $220 per hour would equal 17 hours.  Ms. Smith approved the payment of this TSI invoice to Dr. Buck.

146.    From April 2016 to March 2018, iFOS submitted 24 invoices or claims for payment, and was paid over $628,322 under the contract.  Each of these 24 invoices is subject to a penalty of between $11,665 to $23,331.  The total penalties for these invoices range between $279,960 and $559,994.

147.     During the one-year period following his departure from DHS, Dr. Buck and the
Deputy Director, had extensive direct contact in violation of federal conflict-of-interest rules,
which imposed a mandatory one-year cooling off period from January 9, 2016 to January 8, 2017
prohibiting him from communicating directly with his former agency on behalf of another party
with the intent to influence agency action.

148.     During his one-year cooling off period, Dr. Buck and the Deputy Director spoke
using their personal cellular telephones over 140 times for a total of 35 hours.



149.     During his one-year period following his departure from DHS, Dr. Buck
and the Deputy Director exchanged over 650 text messages.



150.    Upon information and belief, most, if not all, of these calls and texts during the one-year cooling off period related to the iFOS contract with DHS and were made by Dr. Buck on behalf of iFOS with the intent of influencing DHS action relating to the contract.

### COUNT I
### VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A)
### AGAINST ALL DEFENDANTS

151.    The United States re-alleges and incorporates by reference paragraphs 1 through 150 as though fully set forth herein.

152.    By virtue of the wrongful acts described herein, from 2015 through the present, all Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, presented, or caused to be presented, to the United States false or fraudulent claims for payment in violation of 31 U.S.C. § 3729(a)(1)(A).  These claims were false in that: (1) from April 2016 to May 2017, iFOS falsely billed Dr. Buck's time as that of an iFOS employee, B.A.S.; (2) from April 2016 to

January 2017, iFOS failed to disclose Dr. Buck's communications with the Deputy Director for the purposes of influencing the Government's action on the contract in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); (3) at all times, iFOS failed to disclose the role of Dr. Buck and others in steering the contract to iFOS pursuant to which Dr. Buck would personally benefit financially; (4) at all time, iFOS intended not to submit Dr. Buck's name for a suitability background investigation despite agreeing to do so in the contract; and (5) falsely representing in iFOS' Technical Proposal to DHS that B.A.S. would serve as the Strategic Advisor for the contract.

153.    Additionally, the conduct of iFOS and Ms. Smith fraudulently induced the United States to enter into the iFOS contract.  iFOS and Ms. Smith actively concealed Dr. Buck's involvement in the contracting process, including after they learned that DHS would require a suitability background investigation for all off-site contractors such as Dr. Buck.  From December 2015 to March 15, 2016, when the contract was awarded, neither iFOS nor Ms. Smith disclosed Dr. Buck's involvement in iFOS' attempt to be awarded the contract.  iFOS' and Ms. Smith's failure to disclose this information made the representations by iFOS and Ms. Smith that iFOS was a qualified contractor at best misleading half-truths.  iFOS and Ms. Smith had a duty to disclose Dr. Buck's relationship with iFOS to DHS in order in order to correct the misleading impression they had created that iFOS was qualified to be awarded the contract.  Additionally, iFOS and Ms. Smith's representations in the Technical Proposal that BAS would serve as the Strategic Advisor were false.

154.    The United States relied on these fraudulent invoices and claims for payment in paying Defendant iFOS, which resulted in the payment of over $628,000 to which it was not legally entitled.

155.     The false representations, records, statements, reports, and certifications described herein were material to the United States' decision to pay iFOS and had a natural tendency to influence and did influence those payment decisions.  Had the United States known of the false claims for payment identifying BAS as the Strategic Advisor, Dr. Buck's direct contact with the Deputy Director in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); the roles of iFOS, Ms. Smith, and others in steering the contract to iFOS, or that iFOS intended to disregard the mandatory a suitability background investigation for Dr. Buck despite contract requirements, the United States would have not entered into or would have terminated the contract with iFOS. Once DHS learned of Dr. Buck's involvement in the contract, DHS insisted that he submit to a suitability background investigation.  At that point iFOS stopped billing DHS for Dr. Buck's work on the contract.

156.     As a result of the false claims presented, and/or caused to be presented, the United States has suffered actual damages and is entitled to recover three times the amount by which it has been damaged, plus civil money penalties as described in Paragraph 149 above, and other monetary relief as appropriate.

## COUNT II
## VIOLATION OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(1)(B)
## AGAINST ALL DEFENDANTS

157.     The United States re-alleges and incorporates by reference paragraphs 1 through 149 as though fully set forth herein.

158.     By virtue of the wrongful acts described herein, from 2016 through the present, all Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, made, used, and/or caused to be made or used, false records, statements, and certifications material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(b).  In particular, Defendants made,

used, and caused to be made or used, false records, statements, and certifications in the invoices and accompanying documentation of iFOS that were submitted to the United States. These statements were false in that: (1) from April 2016 to May 2017, iFOS falsely billed Dr. Buck's time as that of an iFOS employee, B.A.S.; (2) from April 2016 to January 2017, iFOS failed to disclose Dr. Buck's communications with the Deputy Director for the purposes of influencing the Government's action on the contract in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); (3) at all times, iFOS failed to disclose the role of Dr. Buck and others in steering the contract to iFOS pursuant to which Dr. Buck would personally benefit financially; (4) at all time, iFOS intended not to submit Dr. Buck's name for a suitability background investigation despite agreeing to do so in the contract; and (5) falsely representing in iFOS' Technical Proposal to DHS that B.A.S. would serve as the Strategic Advisor for the contract.

159.   The United States relied on these fraudulent records, statements, and certifications in paying iFOS, which resulted in the payment of over $628,000 to which it was not legally entitled.

160.   The false representations, records, statements, reports, and certifications described herein were material to United States' decision to provide pay iFOS and had a natural tendency to influence and did influence those decisions.

161.   As a result of these false records, statements, reports, and certifications, the United States has suffered actual damages and is entitled to recover three times the amount by which it has been damaged, plus civil money penalties as described in Paragraph 149 above , and other monetary relief as appropriate.

**COUNT III**
**VIOLATION OF THE FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(1)(C)**
**AGAINST ALL DEFENDANTS**

162.    The United States re-alleges and incorporates by reference paragraphs 1 through 149 as though fully set forth herein.

163.    All defendants participated in a conspiracy to get false and fraudulent claims paid by the United States.  Dr. Buck and TSI conspired with iFOS, Ms. Smith, and others, to steer the contract to iFOS, to hide Dr. Buck's involvement with iFOS' performance of the contract, including by way of falsely billing his work as if performed by another iFOS employee and falsely identifying BAS as the Strategic Advisor in iFOS' Technical Proposal in order to avoid a suitability check by DHS, and to hide his direct communications with the Deputy Director about the contract and his intention to influence the DHS' actions on the contract by way of those communications.  All of these actions were taken to allow iFOS to be paid for false invoices under the contract.

164.    These claims were false in that: (1) from April 2016 to May 2017, iFOS falsely billed Dr. Buck's time as that of an iFOS employee, B.A.S.; (2) from April 2016 to January 2017, iFOS failed to disclose Dr. Buck's communications with the Deputy Director for the purposes of influencing the Government's action on the contract in violation of the Ethics in Government Act, 18 U.S.C. § 207(c); (3) at all times, iFOS failed to disclose the role of Dr. Buck and others in steering the contract to iFOS pursuant to which Dr. Buck would personally benefit financially; (4) at all time, iFOS intended not to submit Dr. Buck's name for a suitability background investigation despite agreeing to do so in the contract; and (5) falsely representing in iFOS' Technical Proposal to DHS that B.A.S. would serve as the Strategic Advisor for the contract.

165.     iFOS, Ms. Smith, Dr. Buck, and others entered into an agreement on or about February 22, 2016, pursuant to which iFOS would falsely represent that B.A.S. would be the Strategic Advisor for the iFOS contract.  iFOS, Ms. Smith, Dr. Buck, and others engaged in over acts in furtherance of this agreement and conspiracy by submitting false documents to the DHS, including a false Technical Proposal, falsified time sheets and invoices all of which falsely identified B.A.S., not Dr. Buck, as the Strategic Advisor and, as to the timesheets and invoices, falsely billed Dr. Buck's work as the work of B.A.S.  iFOS, Ms. Smith, Dr. Buck, and others engaged in additional overt acts in furtherance of this agreement and conspiracy by funneling Dr. Buck's communications and work product through other iFOS employees, various iFOS email accounts, and personal cell phone and text message accounts.  iFOS, Ms. Smith, Dr. Buck, and others knew the representation that B.A.S. was the Strategic Advisor was false because they dealt with Dr. Buck in that capacity on a routine, if not daily, basis.  iFOS, Ms. Smith, Dr. Buck and others knew the representation that B.A.S. was the Strategic Advisor to DHS was materials because if DHS knew that B.A.S. was not the Strategic Advisor, DHS would require a background check of Dr. Buck, the actual Strategic Advisor.  iFOS, Ms. Smith, Dr. Buck and others intended for DHS contract personnel to rely on the misrepresentation that B.A.S. was the strategic advisor in order to avoid a background check for Dr. Buck.

166.     The United reasonably States relied on these fraudulent records, statements, and certifications in paying iFOS, which resulted in the payment of over $628,322 to which it was not legally entitled.

167.     The false representations, records, statements, reports, and certifications described herein were material to United States' decision to provide pay iFOS and had a natural tendency to influence and did influence those decisions.

168.     As a result of these false records, statements, reports, and certifications, the United States has suffered actual damages and is entitled to recover three times the amount by which it has been damaged, , plus civil money penalties as described in Paragraph 149 above , and other monetary relief as appropriate.

## COUNT IV
## BREACH OF CONTRACT
## AGAINST DEFENDANT iFOS

169.     The United States re-alleges and incorporates by reference paragraphs 1 through 149 as though fully set forth herein.

170.     On March 15, 2016, iFOS entered into a contract with DHS to provide support for the OUSM's responses to requests from the Government Accountability Office.  This contract imposed various obligation upon iFOS, including the following:

(a)     under FAR 52.232-7(a)(5), incorporated by reference into the contract by reference, to substantive vouchers by individual daily job timekeeping records and verify that the employees met the qualifications for the labor categories in the contract;

(b)     under § H 4.0 "All contractor and subcontractor personnel are required to complete a suitability/background investigation with the DHS Office of Security, Personnel Security Division.

171.      The United States paid iFOS over $628,322 under this contract.

172.     iFOS breached its contractual obligations by, *inter alai,* submitting false invoices and falsified time sheets that billed Dr. Buck's time under B.A.S.' name and by failing to submit his name for a suitability/background investigation by the DHS Office of Security, Personnel Security Division.

173.    As a result of iFOS' breach of contract, the United States has been damaged in an amount to be determined at trial.

## COUNT V
## PAYMENT BY MISTAKE
## AGAINST DEFENDANT iFOS

174.    The United States re-alleges and incorporates by reference paragraphs 1 through 149 as though fully set forth herein.

175.    This is a common law claim by the United States to recover payments made by the United States to iFOS based on a mistake of fact. This Court has jurisdiction to adjudicate this claim pursuant to 28 U.S.C. § 1345.

176.    By virtue of the wrongful acts described herein, from 2016 through the present, iFOS obtained and kept federal funds to which it was not entitled that were paid based on a mistake of fact by the United States.  Specifically, the United States was unaware that iFOS had submitted false claims for payment and false statements to the United States, steered the contract to iFOS by working with Dr. Buck and others, failed to submit Dr. Buck for the mandatory suitability background investigation, and participated in Dr. Buck's violations of conflict of interest obligations set forth in the Ethics in Government Act, 18 U.S.C. § 207(c).

177.    Based on the foregoing, the United States mistakenly paid over $628,322 to iFOS for tainted services, and the circumstances dictate that, in equity and good conscience, the amount of these payments should be returned to the United States.

## COUNT VI
## UNJUST ENRICHMENT
## AGAINST ALL DEFENDANTS

178.    The United States re-alleges and incorporates by reference paragraphs 1 through 149 as though fully set forth herein.

179.    This is a claim by the United States for unjust enrichment under the common law arising from the unjust receipt of federal funds by iFOS and Smith while engaged in the illegal conduct described herein. This Court has jurisdiction to adjudicate this claim pursuant to 28 U.S.C. § 1345.

180.    By virtue of the wrongful acts described herein, from 2016 through the present, Defendants iFOS and Smith directly or indirectly obtained federal funds by which they were unjustly enriched.  Specifically, the United States was unaware that iFOS had submitted false claims for payment and false statements to the United States, steered the contract to iFOS by working with Dr. Buck and others, failed to submit Dr. Buck for the mandatory suitability background investigation, and participated in Dr. Buck's violations of conflict of interest obligations set forth in the Ethics in Government Act, 18 U.S.C. § 207(c).

181.    Based on the foregoing, iFOS and Smith have been unjustly enriched, and the circumstances dictate that, in equity and good conscience, the money should be returned to the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor and against Defendants, jointly and severally, as follows:

1.    On Counts I - III, under the False Claims Act, 31 U.S.C. 3729 et seq., against all Defendants for treble the amount of the United States' actual damages, plus civil penalties as are allowable by law for each false claim or record;

2.    On Count V, for breach of contract, against Defendant iFOS, for the amount paid by the United States to iFOS under the contract plus interest;

3.      On Count VI for payment by mistake against iFOS, for the amount paid to iFOS

by the United States plus interest;

4.      On Count VI against Defendants iFOS and Smith, for the amounts by which the

Defendants were unjustly enriched, plus interest;

5.      For all costs of this civil action; and

6.      For such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case.

Respectfully submitted,

Dated: April 28, 2022

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

EREK L. BARRON
United States Attorney
District of Maryland

By: _____/s/_____
SARAH MARQUARDT (No. 17294)
Assistant United States Attorneys
36 S. Charles Street, 4th Floor |
Baltimore, MD 21201
Telephone (410) 209-4801

JAMIE ANN YAVELBERG
COLIN M. HUNTLEY
ALICIA J. BENTLEY
Attorneys, Civil Division
United States Department of Justice
Post Office Box 261
Ben Franklin Station
Washington, DC 20044

Attorneys for the United States of America