IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | * | |
| *Plaintiff*, | * | |
| v. | * | Civil Case No: 1-22-cv-01053-JMC |
| **INTELLIGENT FISCAL OPTIMAL SOLUTIONS, LLC aka iFOS, et al**, | | |
| | * | |
| *Defendants.* | | |

\* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM OPINION

Plaintiff United States of America brings this False Claims Act ("FCA"), breach of contract, payment by mistake, and unjust enrichment action against Defendants Intelligent Fiscal Optimal Solution, LLC ("iFOS") and Tawanda Smith seeking damages, treble damages, civil penalties, and the amount paid under the relevant contract in compensation for harm caused by Defendants' alleged actions pertaining to iFOS' acquisition of a Department of Homeland Security ("DHS") contract. (ECF No. 1). In addition to Defendants' Motion to Dismiss or for Summary Judgment (ECF No. 13), this Court has considered Plaintiff's Opposition to the Defendants' Motion to Dismiss or for Summary Judgement (ECF No. 28), and Defendants' Reply Memorandum to Plaintiff's Opposition to Motion to Dismiss or for Summary Judgement (ECF No. 31). No hearing is necessary. *See* Loc. R. 105.6. (D. Md. 2021). For the reasons explained below, Defendants' Motion, treated as a motion to dismiss, is DENIED.

### I. BACKGROUND

The following facts are uncontroverted or set forth in the light most favorable to Plaintiff. Defendant iFOS is a limited liability company that was incorporated by Tawanda Smith on or

about April 3, 2009.[1] (ECF No. 1 at ¶ 8). In November and December of 2015, Ms. Smith and others spoke with Dr. Kenneth Buck about potential business opportunities while Dr. Buck was still employed by the DHS. *Id.* at ¶ 17. Prior to leaving DHS, Dr. Buck helped prepare a "Statement of Work," also known as a "Requirements Statement," for the DHS contract that was ultimately obtained by iFOS and is the subject of this entire claim. *Id.* at ¶ 22. Prior to Dr. Buck's retirement from DHS on January 8, 2016, Dr. Buck spoke with the Deputy Director and informed her that Dr. Buck would be working with iFOS upon retirement. *Id.* at ¶ 23. Shortly thereafter, the Deputy Director identified iFOS as a potential contractor to the DHS Office of Procurement Operations (DHS OPO), and iFOS was the only contractor that the Deputy Director seriously considered. *Id.* at ¶ 25. Despite a mandatory "one-year cooling off period" imposed by federal law on Dr. Buck, the Deputy Director never informed anyone else at DHS of Dr. Buck's involvement with iFOS and the contract at issue. *Id.*

The Complaint alleges that iFOS and Ms. Smith conveyed to DHS that an iFOS employee, B.A.S., would serve as "Strategic Advisor" under the DHS contract although Dr. Buck would surreptitiously fill that role despite his mandatory cooling off period. *Id.* at ¶ 30. This concealment was further designed to ensure that Dr. Buck would not have to undergo the mandatory suitability background investigation required by the contract. *Id.* In the months leading to the request for proposal from DHS to iFOS, Dr. Buck had frequent contact with the Deputy Director, and Ms. Smith, Dr. Buck, and B.A.S. plotted to ensure that Dr. Buck could serve as Strategic Advisor without undergoing the mandatory background check. *Id.* at ¶ 26–44.

On March 15, 2016, contract No. HSHQDC-16-C-00040 was executed by iFOS and DHS for a term of March 16, 2016 to March 15, 2018. *Id.* at ¶ 45. Under the contract, only the DHS

---

[1] Defendants assert that Plaintiff incorrectly classified iFOS as a "limited liability corporation," but this alleged mistake has no impact on the Court's analysis.

Contracting Officer responsible for the contract could waive the requirement regarding suitability background investigations, and the officer assigned to this contract never waived this requirement. *Id.* at 46. During the months following the execution of the contract and until July 3, 2017, Ms. Smith signed invoices falsely representing to DHS that B.A.S. performed hundreds of hours of work on the contract that was in fact performed by Dr. Buck. *Id.* at ¶ 62–121. From March 2016 to July 2017, iFOS, Ms. Smith, and others took affirmative steps to conceal from DHS Dr. Buck's involvement with the contract, including: 1) submitting false invoices to DHS showing Dr. Buck's time on the contract performed by iFOS employee B.A.S. while iFOS kept separate internal time records of Dr. Buck's time worked; 2) funneling Dr. Buck's communications with the Deputy Director through the iFOS email accounts of iFOS personnel other than Dr. Buck; creating an email account for Dr. Buck substantially similar to the group account for the contract; and 5) permitting Dr. Buck to work on the DHS contract without completing a DHS mandatory suitability background investigation. *Id.* at ¶ 49.

Beginning on July 30, 2017, after Dr. Buck's cooling off period, Ms. Smith began signing invoices identifying Dr. Buck or his company. *Id.* at ¶ 122. On July 3, 2017, a DHS employee emailed iFOS about a new line item for TSI—Dr. Buck's limited liability company—and asked if TSI "refers to strategic advisory services provided by Dr. Ken Buck[?]" *Id.* at ¶ 121. iFOS personnel confirmed that this item referred to services provided by "Ken Buck." *Id.* Despite another inquiry from DHS on December 12, 2017, Ms. Smith failed to provide DHS with information regarding Dr. Buck's involvement in the contract or his involvement in obtaining the contract. *Id.* at ¶130. When DHS directly asked about "K Buck" on iFOS' invoices on December 21, 2017, Ms. Smith deceitfully claimed that Dr. Buck was an independent contractor and "we obtain background checks and validate security clearances on independent consultants." *Id.* at ¶

3

131. Despite requests from December 2017 to early January 2018, iFOS and Ms. Smith never submitted Dr. Buck for a mandatory background check as required by the contract.

In the present motion, Defendants argue that Plaintiff has failed to state a claim under Federal Rule 12(b)(6) since Plaintiff released all claims, including those against Defendants, in its public settlement agreement with Dr. Buck. (ECF No. 13 at p. 10). Furthermore, Defendants argue that Plaintiff cannot plead quasi-contract claims in the alternative, and that Plaintiff's knowledge imparted through the Deputy Direct bars a claim for payment by mistake. (ECF Nos. 13 & 31).

## II.   STANDARD OF REVIEW

"Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting Fed. R. Civ. P. 8(a)(2)) (other citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft*, 556 U.S. at 678 (2009) (citation and internal quotations omitted). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Regarding dismissal under Rule 12(b)(6), we accept the well-pled allegations of the complaint as true, and we construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). In addition to considering the Complaint when ruling on a Rule 12(b)(6) motion to dismiss, a court may consider "matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*, 551 U.S. 308, 322 (2007); *United States v.*

*Unisys Corp.*, 178 F. Supp. 3d 358, n. 2 (E.D. Va. 2016).[2] Both parties rely upon the settlement agreement between Dr. Buck and DHS, and both rely upon the DHS press release pertaining to that settlement. Therefore, this Court will take judicial notice of those documents in determining this Motion.

III.   **ANALYSIS**

      **a. The United States Only Released Claims Against Dr. Buck in its Settlement Agreement.**

It is clear that the intent of the parties to the April 7, 2022 Buck Settlement Agreement was to release Dr. Buck from claims arising from the covered conduct. (ECF No. 28-1, Exhibit A). "Settlement agreements are enforceable as independent contracts, subject to the same general rules of construction that apply to other contracts." *Alston v. TowneBank*, No. GJH-20-690, 2022 WL 971008, at 4 (D. Md. Mar. 31, 2022) (internal quotations and other citation omitted). "Maryland follows the objective law of contract interpretation and construction." *Id.* (internal quotations and citation omitted). "'A court construing an agreement under this test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Id.* (internal quotations and citation omitted).

The first paragraph of the Buck Settlement Agreement states, "This Settlement Agreement . . . is entered into among the United States of America . . . and Kenneth John Buck, Ph.D." (ECF No. 28-1, Exhibit A p. 1). The language in this agreement releases only Dr. Buck: "upon the United

---

[2] Both parties depend heavily on the "Settlement Agreement" between DHS and Dr. Buck (ECF No. 28-1, Exhibit A), as well as the Department of Justice Office of Public Affairs release regarding that settlement (ECF No. 28-2, Exhibit B). Although Defendants failed to attach these exhibits to their motion, Plaintiff provided the documents in its response. A "court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." *Khoha v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). Therefore, this Court will take judicial notice of the settlement agreement and press release the parties relied upon in their briefs. *See United States ex rel. Sheldon v. Forest Laboratories, LLC*, 499 F. Supp. 3d 184, 201 (D. Md. 2020) (this Court took judicial notice of a rebate agreement when both parties supported their motions and responses with it). This is consistent with the intent of the parties as indicated in their filings.

States' receipt of the Settlement Amount, the United States releases Buck from any civil or administrative monetary claim the United States has for the Covered Conduct . . . ." *Id.* at p. 4. The agreement expressly reserves a variety of claims as not released, including "any liability of individuals other than Buck." *Id.* Furthermore, the agreement asserts, "This Agreement is intended to be for the benefit of the Parties only." *Id.* Tellingly, the only parties to sign this agreement were Dr. Buck, his counsel, and government counsel. *Id.* at p. 14.

The Court is not convinced by Defendants' citation to *Alston* that the failure of the Plaintiff to expressly list claims against Defendants means that Plaintiff intended to release those claims. In *Alston*, this Court did not consider the impact that a general release provision in a settlement agreement had on third parties. *See Alston*, No. GJH-20-690, 2022 WL at 6 ("By the plain language of the Agreement, the parties intended to 'release and forever discharge' each other from any claim falling into the broad scope of 'all claims . . . known or unknown . . . in connection with the Loan . . . or any credit reporting.'"). *Id.* The Court instead agrees with Plaintiff that this issue should be decided in accordance with *U.S. ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908 (4th Cir. 2013). Therein, the 4th Circuit found that a release between two parties "could not serve as a defense to any claims that . . . non-signatories . . . might assert against [defendant]. . . . [T]he release did not prohibit the government or another relator from pursuing similar claims against [defendant]." *Id.* at 913–14. Looking at the objective intent of the parties to the Agreement, this Court believes that there is no ambiguity as to the intent to only release Dr. Buck.[3]

In their reply to Plaintiff's response, Defendants rely upon *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321 (1971). (ECF No. 31). *Zenith* provides:

> Three rules have developed to deal with the question whether the release of one joint tortfeasor releases other tortfeasors who are not parties to or named in the release. The ancient common-law rule, which was grounded upon a formalistic

---

[3] Without an ambiguity, the Court will not look to the press release.

> doctrine that a release extinguished the cause of action to which it related, was that a release of one joint tortfeasor released all other parties jointly liable, regardless of the intent of the parties.

*Id.* at 343 (citing *Western Express Co. v. Smeltzer*, 88 F.2d 94, 95 (CA6 1937)) (other citations omitted). In *Western*, the 6th Circuit recognized that this ancient common law rule was "based on the theory that the release constitutes a satisfaction and extinguishes the cause of action." *Id.* at 95. However, "[w]here the amount received as consideration is not full compensation for the injury, certain courts construe the release as a covenant not to sue the tort feasor released, and as not discharging other tort feasors." *Id.* Here, Plaintiff settled with Dr. Buck for $10,000, but Plaintiff is pursuing a claim against Defendants for damages and treble damages in excess of $2 million. (ECF No. 28 at p. 9). It logically follows that a release of Dr. Buck for $10,000 should not mandate the implementation of an ancient common law rule releasing unreleased joint tortfeasors based upon fair compensation.

Defendants also assert that *Zenith* stands for finding that when a Plaintiff releases one co-conspirator, it thereby releases all others unless the Plaintiff expressly reserves its rights against the others. (ECF No. 31 at p. 3). To the contrary, *Zenith* recognizes that this rule has been "adopted with some variation by statute in 21 States." *Zenith*, 401 U.S. at 345. However, the United States Supreme Court adopted the final of the three potential rules espoused in *Zenith*: "the effect of a release upon coconspirators shall be determined in accordance with the intentions of the parties." *Id.* As stated above, this Court finds that the intention of the parties to the Dr. Buck Settlement Agreement is clear: only Dr. Buck was to be released from liability to the United States for the conduct covered in the agreement. Therefore, Defendants' argument that Plaintiff has failed to state a claim on all their counts because Plaintiff has released Defendants must fail.[4]

---

[4] Contrary to Plaintiff's assertion, Defendants challenged each claim under the theory that Defendants were released pursuant to the Dr. Buck Settlement Agreement. Therefore, Defendants did challenge the breach of contract claim.

7

      **b. There was an Express Contract Between Plaintiff and Defendant iFOS, but Plaintiff Can Plead Alternative Quasi-Contract Claims.**

Because Plaintiff asserts "the United States would not have entered into or would have terminated the contract with iFOS . . ." had it known of Dr. Buck's involvement, Plaintiff is free to plead quasi-contract claims in the alternate. (ECF No. 1 at ¶ 155). Defendants are correct to assert that in Maryland, quasi-contract claims are only available when an express contract does not exist between the parties. *Miller v. U.S. Foodservice, Inc.*, 361 F. Supp. 2d 470, 484 (2005) (citation omitted). The Court of Special Appeals of Maryland has noted, "The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests." *Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 86 (2000). "There is, however, an exception for False Claims Act cases where the government alleges that the contract was invalid because the defendant fraudulently induced the government to enter into the contract—including an agreement on a particular price." *United States v. DynCorp International, LLC*, 253 F. Supp. 3d 89, 114 (D.D.C. 2017) (citing *United States ex rel. Shemesh v. CA, Inc.*, 89 F.Supp.3d 67, 80–81 (D.D.C. 2015) (denying motion to dismiss claims for unjust enrichment and payment by mistake because government alleged it would not have entered the contract but for defendant's fraudulent conduct)). Defendants rely on a case that further supports this fraud exception to pleading quasi-contract claims in the alternative: "However, at the hearing, Martin Marietta questioned whether the 'advance agreements' are in fact contracts. So long as there is an issue as to the existence of a contract, the Government can plead a quasi-contractual theory in the alternate." *U.S. ex rel. Mayman v. Martin Marietta Corp.*, 894 F. Supp. 218 (D. Md. 1995).

      Plaintiff is free to bring its quasi-contract claims in the alternate based upon the fraud exception to the general rule.

### c. Plaintiff Has Properly Plead a Claim of Common Law Unjust Enrichment as to Defendant Ms. Smith.

Defendants assert that Plaintiff has failed to plead unjust enrichment as against Ms. Smith because Plaintiff paid only iFOS under this contract. (ECF No. 13 at p. 15). "A claim of unjust enrichment is established when: (1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows or appreciates the benefit; and (3) the defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return." *Benson v. State*, 389 Md. 615, 651–52 (citation omitted). In *United States v. Berkely Heartlab, Inc.*, defendant Mallory argued "that unjust enrichment is inapplicable as a matter of law because she did not directly receive money from the Government. Instead she received 'compensation as CEO' of HDL." *United States v. Berkely Heartlab, Inc.*, 225 F. Supp. 3d 487, 503 (D. S.C. 2016). The court in *Berkely* rejected this argument because the defendant knew of and had participated in the scheme to provide fraudulent services, defendant's corporation had been paid more than $325 million, and defendant was compensated by her company's profits.[5] *Id.*

Under Maryland law, the courts have "not required always that a benefit conferred in an unjust enrichment action come necessarily and directly to the defendant from the plaintiff[']s own resources." *Hill v. Cross Country Settlements, LLC*, 402 Md. 281 (2007) (citation omitted). "It is immaterial how the money may have come into the defendant's hands, and the fact that it was received from a third person will not affect his liability, if, in equity and good conscience, he is not entitled to hold it against the true owner." *Plitt v. Greenberg*, 242 Md. 359, 364 (1966). Here, the Complaint indicates that Ms. Smith was involved with the fraudulent scheme from the

---

[5] This case was decided pursuant to the "federal common law remedy of unjust enrichment . . . ." *Berkely*, 225 F. Supp. 3d at 503.

beginning, Ms. Smith signed fraudulent invoices knowing they were fraudulent, and was the sole president, Chief Executive Officer, and shareowner of iFOS throughout this fraudulent scheme.[6] (ECF No. 1). Contrary to Defendants' argument, Plaintiff is not attempting to hold Ms. Smith liable for the obligation of iFOS solely based upon Ms. Smith being a member of the LLC. *See Allen v. Dackman*, 413 Md. 132, 154 (2010) (a member of an LLC will not be liable solely by reason of being a member of the [LLC] (citing § 4A-301- of the Corporation and Associations Article)). Rather, Plaintiff is seeking to hold Ms. Smith liable for her personal conduct throughout the fraudulent scheme. *Allen*, 413 Md. at 154 ("An LLC member is liable for torts he or she personally commits, inspires, or participates in because he or she personally committed a wrong, not 'solely' because he or she is a member of the LLC.") (citation omitted).

The Complaint sufficiently alleges conduct on behalf of Ms. Smith which would subject her to liability under a theory of unjust enrichment pursuant to Maryland law.

### d. Plaintiff Has Sufficiently Plead a Claim for Common Law Payment by Mistake.

Defendants claim that Plaintiff has not sufficiently plead payment by mistake because Plaintiff had actual knowledge of Dr. Buck's misconduct by virtue of Plaintiff's own employee, the Deputy director.[7] "A claim for payment by mistake of fact allows the Government to recover funds which its agents have wrongfully, erroneously, or illegally paid." *United States v. Fadul*, DKC 11-0385, 2013 WL 781614, at *12 (D. Md. 2013) (citations and internal quotations omitted). "[I]f the government knows and approves of the particulars of a claim for payment before that

---

[6] Additionally, the complaint alleges, amongst other actions, that Ms. Smith: (1) met multiple times with Dr. Buck while he was a federal employee, (2) met with DHS contracting personnel without disclosing that Dr. Buck had assisted her and that she planned for him to work as the Strategic Advisor, and (3) decided that B.A.S. would be falsely identified as the Strategic Advisor. (ECF No. 1).

[7] Defendants assert that this actual knowledge is proven in both the Complaint and the DHS Press Release. (ECF No. 1 & ECF No. 28, Exhibit B).

claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim. In such a case, the government's knowledge effectively negates the fraud or falsity required by the FCA." *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th Cir. 199) (citation omitted). However, Plaintiff directs the Court to the exception carved out in *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, No. 5:13-CV-2168-LCB, 2020 WL 5408212 (N.D. Ala. Sept. 9, 2020). The argument in *Hunt* is strikingly similar to Defendants' argument here: "the defendants argue [defendant] Parsons could not have knowingly submitted a false claim because it was relying on a directive from . . . a government employee." *Id.* at *5. In *Hunt*, the government employee involved in awarding the relevant contract to third parties was complicit in the fraudulent scheme. *Id.* at *1–2. However, this knowledge on the part of the government employee did not defeat the FCA claims brought in that case. *Id.* at *5.

Defendants argue that knowledge imparted to Plaintiff through the Deputy Director's participation in the fraudulent scheme is sufficient to defeat the claim of payment by mistake. (ECF No. 13 at p. 16). "Where it seeks to recover payments made as a result of false claims, the Government must show that it made . . . payments under an erroneous belief which was material to the decision to pay." *Fadul*, DKC 11-0385, 2013 WL 781614, at * 12.[8] Neither Plaintiff nor Defendants cite a case wherein the government's knowledge as to the scheme defeated a claim for payment by mistake. However, this Court finds *U.S. ex rel. Durcholz v. FKW Inc.*, 997 F. Supp. 1159 (S.D. Ind. 1998), aff'd, 189 F.3d 542 (7th Cir. 1999) to be highly informative. "[M]ost courts have not held the government's knowledge to be an automatic bar to a FCA claim." *Durcholz*, 997 F. Supp. at 1167 (citation omitted). "The extent and nature of government knowledge may show

---

[8] Defendant first raises the issue of materiality in their Reply Memorandum to Plaintiff's Opposition to Motion to Dismiss or for Summary Judgment. (ECF No. 31). The Court, viewing the facts in the light most favorable to Plaintiff, recognizes that the Deputy Director assisted in concealing Dr. Buck's involvement in the contract, and other DHS personnel began inquiring into Dr. Buck's involvement as soon as he was listed on invoices. (ECF No. 1).

11

that the defendant did not 'knowingly' submit a false claim." *Id.* (citation omitted). Although "[k]nowledge of falsity [by defendant] is not a requisite for recovery under the mistake doctrine," this Court is convinced that the same standard for determining Plaintiff's knowledge of the false claims submitted for FCA purposes should be used in determining whether Plaintiff's knowledge bars a claim of payment by mistake. *See United States v. Mead*, 426 F.2d 118, 125 n.7 (9th Cir. 1970).

Plaintiff's complaint indicates that from November and December of 2015 until July of 2017, the only employees in DHS to know of the fraudulent scheme were the two employees/ex-employees who were involved in it: Dr. Buck and the Deputy Director. (ECF No. 1). Upon the disclosure of Dr. Buck's involvement on an invoice in July of 2017, DHS immediately contacted defendants to inquire into Dr. Buck's involvement. (ECF No. 1). Furthermore, the officer in charge of the contract for DHS never waived any suitability background check, and DHS personnel reiterated this to Ms. Smith when informing her that independent consultants for iFOS were subject to the mandatory background checks. *Id.* at 137. It is apparent that only the Deputy Directors concealment of this scheme resulted in the payments of the invoices. Therefore, the knowledge the Deputy Director, acquired through her participation in this fraudulent scheme, cannot be said to impute knowledge on the part of Plaintiff. *See Durcholz*, 997 F. Supp. 1159 (finding that the involvement of multiple government officials was enough to satisfy the defense of knowledge on the part of plaintiff).

The knowledge of the Deputy Director is not enough to defeat Plaintiff's claim for payment by mistake.

## IV. CONCLUSION

For these reasons, Defendants' Motion to Dismiss or for Summary Judgement (ECF No. 13) is DENIED. A separate order follows.

Date: September 28, 2022 _____/s/_____

J. Mark Coulson
United States Magistrate Judge